*Decision will be entered under Rule 50.*

HENRY F. DU PONT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 101646.   Promulgated June 25, 1943.

*Beverly R. Robinson, Esq., Weston Vernon, Jr., Esq.,* and *J. R. Fillman, Esq.,* for the petitioner.
*L. W. Creason, Esq.,* for the respondent.

## OPINION.

OPPER, *Judge:* The deficiency in gift tax determined against petitioner is resisted on two principal grounds: (1) that no taxable gift took place, and (2) that the respondent's valuation was excessive. The disputed taxable event was the relinquishment by petitioner of a retained power to designate among specified beneficiaries who should be entitled to receive the remainder interest upon the death of the life tenant. The issue is the imposition of a gift tax upon the value of the remainder, no question as to the life estate being involved.

The principle of *Sanford's Estate* v. *Commissioner*, 308 U. S. 39,

seems to us to bring this relinquishment within the category of taxable gifts. True, a final and irrevocable release of all control by petitioner when he originally established the trust creating the gift in 1927 might have resulted in an act of such finality that the gift having been complete when made could not subsequently become subject to a gift tax. But here that control was retained through petitioner's power to select the beneficiaries. In its own field it was complete, for if petitioner survived the life tenant he could manifest his choice by deed, and if he predeceased her he could do so by his will.

The contingency over which he had no control, namely, the chronological relation of the death of the life tenant to his own, was therefore not a condition to the existence of the power, but merely the determinant of the method of its exercise. There clearly was that "retention of control over the disposition of the trust property whether for the benefit of the donor or others [which] renders the gift incomplete until the power is relinquished whether in life or at death" of which the *Sanford* case speaks. This would sufficiently reconcile the dictum in *Emily Trevor*, 40 B. T. A. 1241, to which petitioner refers, if that case were still to be treated as authoritative. Cf. *Burnet* v. *Guggenheim*, 288 U. S. 280.

Petitioner concedes that it is not a sufficient distinction from the *Sanford* case that he here retained only a special power limiting his designation to a specified group of beneficiaries. *Higgins* v. *Commissioner* (C. C. A., 1st Cir.), 129 Fed. (2d) 237; certiorari denied, 317 U. S. 658. And if the test is whether a failure to exercise the retained power at death, in the absence of such an *inter vivos* renunciation as occurred here, would be taxable as part of petitioner's estate, the authorities indicate an affirmative answer. *Estate of Homer G. Day*, 41 B. T. A. 580; *Fidelity-Philadelphia Trust Co.*, 34 B. T. A. 614; *H. T. Cook et al., Executors*, 23 B. T. A. 335; affd. (C. C. A., 3d Cir.), 66 Fed. (2d) 995; certiorari denied, 291 U. S. 660. Thus, if upon the life tenant's death or at any time thereafter prior to his own, petitioner exercised the power by deed and thus destroyed it, the gift tax would then accrue. See *Sanford's Estate* v. *Commissioner, supra;* Regulations 79, art. 3, as amended by T. D. 5010; *Higgins* v. *Commissioner, supra*. If he exercised it by will, the estate tax would clearly bring the property into his gross estate; and this would be equally true if the property passed at his death upon default of the designation by him. *Porter* v. *Commissioner*, 288 U. S. 436; *Estate of Homer G. Day, supra; Fidelity-Philadelphia Trust Co., supra; H. T. Cook et al., Executors, supra*. Hence, the only occasion by which the earlier uncompleted gift could become complete in the absence of these taxable contingencies was the surrender in petitioner's lifetime of the right of selection. This then becomes the occasion for the gift tax to attach, and justifies the

respondent's action in this respect. *Sanford's Estate* v. *Commissioner, supra; Burnet* v. *Guggenheim, supra.*

Nor do the provisions of the Revenue Act of 1942, section 452,[1] affect this conclusion. It is evident that the exceptions set forth in subdivisions (b) and (c) are designed only to limit the effect of the amendment which it was the basic purpose of the section to effect.[2] No necessity existed for bringing within the scope of the gift tax the exercise or release of a power of appointment previously created by the donor himself. *Sanford's Estate* v. *Commissioner, supra.* The evident purpose was merely to add to the category of taxable gifts the exercise or release of a power of appointment received by the holder of the power from another. It follows that the provisions limiting the operation of these amendments to future releases could be no broader than the operation of the amendments themselves; and that they were not intended to and did not exempt relinquishment of powers of appointment over gifts created by the same donor, the existence of which had previously resulted in such lack of completeness of the prior gift as to exclude it from the operation of the gift tax.

If there were any doubt of the correctness of this construction, the legislative history of the section puts it entirely beyond dispute. The limitations upon the operation of the section provided by subdivisions (b) and (c) were first added by a floor amendment in the Senate. To these the conference managers for the House agreed in substance. The report of the Conference Committee contains the following language:

* * * The House recedes with certain technical amendments. These amendments, in accordance with the entire tenor of sections 403 and 452 of the House bill, apply only to powers received by the individual from another person, and do not affect the present status of powers reserved to an individual by himself. See *Estate of Sanford* v. *Comm.* (308 U. S. 39 (1939) ).

* * * * * * *

[1] (b) POWERS WITH RESPECT TO WHICH AMENDMENTS NOT APPLICABLE.—
(1) The amendments made by this section shall not apply with respect to a power to appoint, created on or before the date of enactment of this Act, which is other than a power exercisable in favor of the donee of the power, his estate, his creditors, or the creditors of his estate, unless such power is exercised after the date of enactment of this Act.

* * * * * * *

(c) RELEASE ON OR BEFORE JANUARY 1, 1943.—
(1) A release of a power to appoint before January 1, 1943, shall not be deemed a transfer of property by the individual possessing such power.
(2) This subsection shall apply to all calendar years prior to 1943.

[2] SEC. 452. POWERS OF APPOINTMENT.
(a) GENERAL RULE.—Section 1000 (relating to imposition of gift tax) is amended by inserting at the end thereof the following new subsection :
"(c) POWERS OF APPOINTMENT.—An exercise or release of a power of appointment shall be deemed a transfer of property by the individual possessing such power. * * *"

That report was acted upon favorably by both Houses. We are satisfied that the authority of the *Sanford* case and its application to the situation in controversy are undiminished by the subsequent legislation.

We have fixed the value of the corpus of the trust fund at a price per share of $135. This is some 18 points below the per share price at which the stock was selling on the New York Stock Exchange on the date of the gift. In the light of the evidence, however, we are satisfied that the actual sales figures are not to be taken as an accurate reflection of value by reason of the size of the block involved in the gift which consisted of upwards of 50,000 shares of the same stock. This is not the result of any automatic assumption that a large number of shares is necessarily of a different value as to each share than a smaller number. But it is now as well settled as may be, considering that the Supreme Court has never passed upon the question, that whether the size of the block involved affects the value of a given number of shares is a matter which may be shown by the evidence. *Safe Deposit & Trust Co. of Baltimore*, 35 B. T. A. 259; affd. (C. C. A., 4th Cir.), 95 Fed. (2d) 806; *Helvering* v. *Maytag* (C. C. A., 8th Cir.), 125 Fed. (2d) 55; certiorari denied, 316 U. S. 689.

There was uncontradicted testimony from petitioner's witnesses that in their opinion the sale of a block of that size on or about the date in question at stock market prices would have been impossible. If such a view was excessively pessimistic, the respondent had ample opportunity to produce contrary evidence, but this was not done. He contended strenuously at the hearing, and continued to do so in his brief, that petitioner's testimony was inadmissible and should be disregarded. But the respondent's regulations on the subject take notice of the present situation and permit "some reasonable modification" where "it is established that the value per bond or share of any security determined on the basis of a selling or bid and asked prices as herein provided does not reflect the fair market value thereof." Regulations 79 art. 19 (3), as amended by T. D. 4901. It would be in the highest degree anomalous, and this portion of the regulation would be deprived of all meaning, if a taxpayer were prevented from establishing by testimony the very fact which the regulation requires as the premise for the "reasonable modification" of market prices which the same provision permits. There may be better ways to submit such proof, although they are not readily apparent, but we cannot for that reason refuse to consider the opinions of qualified witnesses in the absence of better evidence and in fact of any at all.

Once we are satisfied that the Stock Exchange prices do not accurately reflect the fair market value of the large block of stock with which we are here concerned, it becomes necessary to fix some other

figure which appears to us to be the price at which the stock could have changed hands. One of petitioner's witnesses testified that although in his opinion the block could not have been sold at the quoted price of 153⅛ within 90 days or at prices averaging 10 points less, he admitted that he thought it could have been sold at an average of 20 points under that figure. Another witness for the petitioner was of the opinion that during a 90-day period prices 15 to 20 points below the average market prices during that time could have been realized for the entire amount. The record shows that for the two months following January 5, the date of the gift, market prices were in the neighborhood of $150 and although the remaining 26 days of March are not shown, the mean of the high and low for that month was approximately the same as that for the two months preceding.

Taking the testimony of these two witnesses in its aspect most unfavorable to petitioner, which seems to us reasonable in view of their production and sponsorship by him, it thus follows that within a 90-day period the stock could have been sold at prices averaging $135 per share. For a block of this size 90 days would not be an unreasonable time to expect marketing operations to continue. We do not by this mean to imply that this period would be the limit of reasonableness, but the evidence shows that prices declined during April and May, with the result that even though a longer period should be considered, there might yet be no appreciable improvement in the prices realized. From the entire record we have accordingly reached the conclusion that the fair market value per share on the date of the gift of the property constituting the corpus of the trust was $135.

The value of the gift itself, consisting of the remainder after the death of the life tenant, aged 61 at the time of the gift, remains to be discussed. In fixing this we have accepted the commutation determined by respondent, in accordance with his regulations, which in our opinion has not been shown to be unreasonable. The figure in question, sometimes referred to as the remainder factor, consists of the present value of one dollar due at the end of the year of death of a person 61 years of age, computed from the Actuaries' or Combined Experience Table of Mortality with interest at 4 percent.

The case of *Anna L. Raymond*, 40 B. T. A. 244, upon which petitioner relies, is inapposite in at least two fundamental respects. The taxpayer there had paid to certain institutions, in exchange for their agreements in the nature of annuity contracts, sums which the Board considered to be in excess of reasonable cost of the agreements. The balance was treated as a gift. Since the parties had made no such division, it became necessary to discover a proper figure to attribute to the purchase of the annuities on the one hand, and to the gift on the other. What could be more natural than that the Board should

resort to an inspection of the charges which would be made for similar contracts by those in the business of issuing them,[3] namely, insurance companies? This conclusion was in effect a forecast of the decision in *Guggenheim* v. *Rasquin*, 312 U. S. 254, holding that the fair market value of a donated single premium life insurance policy is what it would cost to purchase such a policy from an insurance company.

That this was the effect of the Board's decision appears from both the majority and the minority statements. The respondent had calculated a commuted value by reference to his estate tax regulations and to the Actuaries' or Combined Experience Table of Mortality therein adopted: The Board's opinion comments:

* * * The evidence shows that a later table called the "American Annuitants' Mortality Table" is a more approved table and is now commonly in use among insurance companies in the United States.

The opinion then refers to the "American Annuitants' Mortality Table" as being the means by which "the petitioner's expectancy at the dates of the several agreements can readily be computed *to arrive at the reasonable cost which petitioner would have paid to the five leading insurance companies for the annuities which she bought* * * *.*" [Italics added.] And the dissenting opinion construes the prevailing view as being that: "The amount that was paid as consideration for the annuity is found by the majority opinion to be that which would have been paid to the five leading insurance companies under the American Annuitants' Mortality Table."

In the present case it requires no fine discrimination to recognize that the life tenant did not buy an annuity from anyone nor pay any amount to anyone to act as consideration for such an agreement of annuity; and there is no issue in this case which requires us to find what the life tenant would have had to pay for such an agreement in order to discover how much it is reasonable to assume that she did in fact pay, as was the case in the *Raymond* proceeding. The life estate in question here was given; it was not bought. It bears no true resemblance to an insurance company annuity. There is no insurance company or institution involved in the contract. There is no agreement to pay a stipulated amount; and there is no assurance of an

---

[3] Respondent's own Regulations 79, 1936 edition, provide:

Article 19. *Valuation of property.* * * *

* * * * * * *

(7) *Annuities, life, remainder and reversionary interest.*—For valuation of annuities purchased from life insurance companies or other companies issuing annuity contracts, see subdivision (9) of this article. * * *

* * * * * * *

(9) *Life insurance and annuity contracts.*—The value of a life insurance contract or of a contract for the payment of an annuity issued by a company regularly engaged in the selling of contracts of that character is established through the sale of the particular contract by the company, or through the sale by the company of comparable contracts. * * *

annual income irrespective of the annual earnings. This is the essence of the distinction between an annuity and a life estate. *Burnet* v. *Whitehouse*, 283 U. S. 148; *Helvering* v. *Butterworth* (*Pardee*), 290 U. S. 365.

In the second place, even if we assume that a method of valuation comparable to that in the *Raymond* case would be relevant here, it is the opposite or converse type of valuation which must be engaged in. In the *Raymond* case the necessity arose to inquire into the reasonable cost of an annuity. In the present case the property to be valued is not the annuity or life estate but the remainder. True, life estate and remainder are theoretically two parts of a whole, which should be subject to mutual calculation by means of subtraction from the value of the whole. But so are life insurance policies and annuities two parts of a whole. *Helvering* v. *Le Gierse*, 312 U. S. 531. Yet we know that insurance companies adopt different mortality tables for computing the premium on life insurance from those used to establish the cost of annuities. In the words of one of the petitioner's witnesses, "We would select the best tables to accomplish what was to the best interests of the company, taking all of the factors into account."

In other words, if we were seeking to discover here what an insurance company would regard as the value of the remainder estate or what perhaps we might say a hypothetical insurance company would be willing to sell such a remainder estate for if it were in the business of selling such contracts, as well as annuities, it would be to the tables which an insurance company employs for computing such values, and not to the tables which it employs for computing annuity costs, that we should resort. No such tables are availavle because insurance companies do not deal in these commodities, but since remainders, like life insurance, are the reciprocal of annuities, perhaps the nearest to this that actually exist are the tables which deal with life expectancies for the purpose of computing life insurance premiums.[4] These tables are comparable to those used by respondent.[5]

It follows that no more than in the case of *Estate of Charles H. Hart*, 1 T. C. 989, is there any evidence in this record sufficient to demonstrate that there are more accurate figures to which we can turn than those employed for the purpose by the respondent. As that case points out:

* * * Valuation for estate or inheritance tax purposes is computed in some 17 states by the use of the Actuaries' or Combined Experience Mortality Table,

---

[4] In the case of a life insurance policy or the hypothetical sale of a remainder, the sooner the insured—or life tenant—dies, the greater the detriment to the issuing company; whereas, with an annuity, the sooner the annuitant dies, the better for the company.

[5] E. g., under the American Men Table, which is presently used by mutual insurance companies for the purpose of computing premium rates on life insurance for both men and women, the remainder factor of a person 61 years of age, at 4 percent interest, comes to .600902 (see P. H. Inheritance and Transfer Tax Service, 11th Ed., p. 838), as compared with the respondent's factor of .61163.

with 4, 5, or 6 percent interest, and approximately 20 other states use . the American Experience Table of Mortality, with interest at 5 or 6 percent * * *. In New York State the use of the Actuaries' or Combined Experience Table of Mortality, with 4 percent interest, is prescribed by statute * * *.

We can not say under those circumstances that the provisions of the Commissioner's regulations are unreasonable or arbitrary. See *Robinette* v. *Helvering*, 318 U. S. 184. And as there is no evidence here that the tables adopted by insurance companies in their own financial interest for pricing annuities furnish a more accurate basis for evaluating this remainder than the Commissioner's method, it is true here, as it was in the *Hart* case that "There may be better and more accurate methods, but we can not for that reason disapprove of a method long in use without evidence establishing a better one." See *F. J. Sensenbrenner*, 46 B. T. A. 713; affd. (C. C. A., 7th Cir.), 134 Fed. (2d) 883.

In determining the remainder factor we have assumed an interest rate of 4 percent. This finds support in material produced by both parties. It is the interest figure adopted for tables in the Commissioner's regulations. Regulations 79, 1936 Edition, article 19 (9), table A. It is also the rate accepted as correct under the circumstances of the present case by one of the witnesses produced and vouched for by petitioner. Four percent is perhaps an overly high rate to be assumed for safe investment under current economic conditions.[6] Cf. *Simpson* v. *United States*, 252 U. S. 547. But it may be said that the trend of lower interest rates tends to offset any increase in the expectancy of life from the standpoint of computing remainder value. The assumption of an interest rate higher than contemporary conditions would justify thus tends to equalize any slight error caused by the use of mortality tables which have not been corrected to reflect current life expectancy,[7] and presumably for that reason, respondent accepts the 4 percent rate to accompany his mortality figures.

In approving the use of 4 percent interest under the circumstances of the present case, petitioner's witness emphasized that the trustees were empowered to convert the corpus of the trust if it appeared that the safety of the investment was endangered. We think it reasonable to conclude that the 4 percent rate is at least not too low in view of this testimony, of the character of the investment, and of the terms of the trust.

---

[6] For example, one of petitioner's witnesses testified :
"* * * the rate of return which would normally be expected in the life insurance business, among life insurance companies, the expectation was around 3½ percent * * *. That was the expectation, on which they were computing their estimates of rates where they had to compute their rates very carefully in the stock companies. They were using 3½ percent."

[7] For example, according to one of petitioner's witnesses, if the United States Life Tables of Mortality (census figures) for 1930–1939 be combined with an interest factor of 3 percent, the present value of a dollar due at the end of the year of death of a while female aged 61 is .619, compared with the factor used by respondent of .61163. No similar figure appears in the record for 3½ percent interest.

We have accordingly concluded that the relinquishment by petitioner in the tax year before us of his power to designate the beneficiary entitled to take the remainder constituted a taxable gift; that the value of that gift is to be computed by measuring the corpus of the estate at the rate of $135 a share; and by commuting the result by use of the remainder factor employed by respondent, the evidence failing to show that the Commissioner's method was erroneous or that there are more accurate methods available than the one he used.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DISNEY, *J.*, concurs only in the result.

———

MELLOTT, *J.*, concurring: With some reluctance I concur in the holding that the shares of stock had a value of only $135 per share on the basic date. In my opinion a higher figure might well have been adopted. I am persuaded to accept the lower one for two reasons: first because I agree with my associates that the Stock Exchange prices do not accurately reflect the fair market value of such a large block of stock and second because the value determined seems to be supported by substantial evidence.

The result reached upon the last point seems to be the only one which could be reached upon the present record. I therefore concur in it though it is quite unfortunate that a question of such importance must be resolved upon a mere "failure of proof." A few remarks upon the general subject may not be amiss.

The evaluation of a reversion interest—the right to receive a sum of money after the death of another—is at best a difficult one. A reasonably close approximation may be made through the use of mortality tables as one factor and an assumed interest rate as another. *Ithaca Trust Co.* v. *United States,* 279 U. S. 151. The two factors, however, ought to be as accurate as possible. We have heretofore expressed the view that the table used by respondent is incorrect and "outmoded" in dealing with an annuity question. *Anna L. Raymond,* 40 B. T. A. 244; affd., 114 Fed. (2d) 140; certiorari denied, 311 U. S. 710. Disregarding the rule of *stare decisis,* the evidence in the instant proceeding would clearly justify a similar conclusion if the same question were involved. The correctness of the interest factor, to say the least, has not been demonstrated. In my judgment it is too high. While it is true that an overly high interest rate may tend to offset any increase in the life expectancy of the one having the income for life, this is a mere fortuitous circumstance. The result of using two incorrect factors may well be to increase the error.

The present question is almost an "imponderable." Whether this tribunal should attempt to formulate a new table based upon the best

and most reliable statistics and using an interest factor other than that used by the respondent or by actuaries is debatable. However that may be, it is devoutly hoped the administrative authorities will ultimately devise one which will not be so vulnerable to attack as the one now in use.

———

MURDOCK, *J.*, dissenting: The Commissioner determined that the value of the du Pont shares on January 4, 1939, was equal to the price at which similar shares were selling upon the market at that time. Actual sales of similar property on or near the valuation date are regarded as the best evidence of fair market value although this may be changed by other evidence showing that those sales do not reflect the fair market value. The prevailing opinion does not regard actual sales figures as truly reflecting value here because of the size of the block involved in the gift. It applies a so-called "blockage" rule. The rule as applied here means that we reduce the value of shares from the quoted market prices by accepting the opinions of witnesses for the petitioner, men experienced in marketing stocks, who have expressed opinions, based upon market conditions, that a seller would have been required to accept prices substantially under the market in order to sell a block of 52,900 shares within a reasonable time beginning on January 4, 1939.

Fair market value has been defined for tax purposes as the price at which property would pass from a willing seller to a willing buyer if each had reasonable knowledge of the facts and was not acting under any compulsion. The existence of both of these imaginary people must be assumed. That is, it must be assumed that there is a person with reasonable knowledge of the facts and without any necessity for selling who desires to sell 52,900 shares of this stock, and also that there is another person willing to buy that number of shares who has reasonable knowledge of the facts and is not under any necessity of buying. The question is, Upon what price would they agree? It seems to me that the prevailing opinion, relying upon the petitioner's witnesses, considers the question too much from the standpoint of a seller, apparently a seller who had to convert the shares into cash. The shares here in question were not for sale. If it is pertinent to inquire how much a willing seller could have obtained for his shares, it would seem to be equally pertinent to inquire how much a willing buyer would have to pay for 52,900 shares if he had gone on the market at that time, and also to inquire what effect his efforts to buy would have had upon the market. Suppose the petitioner had used $8,100,312.50 to purchase du Pont shares on or about January 4, 1939, or had given that cash to the trust and the trust had attempted to purchase du Pont shares. Is there any reason

to believe that the cash would have purchased substantially more than 52,900 shares? The question should not be examined from one side alone. It is not proper to assume that the purchaser would receive all of the advantages in the negotiations. The opinion evidence, which is all right as far as it goes, fails to convince me that the current market figures were not the best evidence of the fair market value of du Pont stock on January 4, 1939.