SEWELL L. AVERY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 112526. Promulgated June 6, 1944.

*Leland K. Neeves, Esq.*, for the petitioner.
*Gerald W. Brooks, Esq.*, and *Frank T. Donahoe, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge*: The single issue before us is the correct valuation of shares of Montgomery Ward & Co. and United States Gypsum Co. stock made the subject of gift by the petitioner in the trust agreements of December 31, 1940.

The Commissioner follows and relies on his regulations,[1] which state that the fair market value of stocks and bonds listed on the stock exchange is the mean between the highest and lowest quoted selling price on the day of the gift. On this basis he has determined such value to be $37.50 per share for the Ward stock and $64.50 for the Gypsum stock.

The petitioner contends that the proper basis of valuing stock transferred in large blocks is the price which the seller or transferor would receive under the custom and usage governing such transactions. He contends that Ward and Gypsum stock in blocks of the size here involved could not have been sold in ordinary course on the market and that the normal and usual method of disposing of such blocks is by secondary distribution, a well recognized practice.

This and other courts have held that the effect of the size of the block of listed stock, given or transferred, upon the value of the stock per share is a question of fact. *Helvering* v. *Maytag*, 125 Fed. (2d) 55; certiorari denied, 216 U. S. 689 (see cases there cited); *Commissioner* v. *Shattuck*, 97 Fed. (2d) 790; *Helvering* v. *Safe Deposit & Trust Co. of Baltimore*, 95 Fed. (2d) 806, affirming 35 B. T. A. 259; *Henry F. du Pont*, 2 T. C. 246. In valuing shares of stock for gift tax purposes the correct criterion is the fair market value of all of the stock comprising the gift, not merely a single share thereof. *Helvering* v. *Maytag, supra.*

Petitioner contends that either the two gifts should be considered as one, in which event the value of the stock should be based on the aggregate blocks of 26,000 shares of Montgomery Ward and 16,000 shares of Gypsum, or the corpus of each trust should be considered separately as the gift to be valued, the amounts in question in each instance being 13,000 shares of Montgomery Ward and 8,000 shares of Gypsum. The respondent argues that the petitioner's donation should be divided into four gifts, one each to his two daughters and their respective husbands, the four being the beneficiaries of the trusts. Respondent cites *Helvering* v. *Hutchings,* 312 U. S. 393; *Lawrence C. Phipps*, 43 B. T. A. 1010; affd., 127 Fed. (2d) 214, and other cases to support his position.

Respondent's position that four gifts are presented for valuation is well fortified both in the law (*Helvering* v. *Hutchings, supra; United States* v. *Pelzer*, 312 U. S. 399) and in the provisions of the trust instruments themselves. The trust agreement referring to petitioner's daughter Arla and her husband specifically provided that the "Settlor desires to create certain trusts for the use and benefit of his

---

[1] Art. 19, Regulations 79 (1936 Ed.), as amended by T. D. 4901, May 18, 1939, 1939–1 (Part I) C. B. 341. This regulation also provides that if the formula prescribed therein does not, under the facts, reflect fair market value, a reasonable modification of the formula or other relevant facts shall be considered.

daughter, ARLA AVERY McMILLAN, and her husband, WILLIAM BENTON McMILLAN, and the other beneficiaries hereinafter named or described, upon the terms and conditions hereinafter set forth."

The agreement further provided:

FIRST: The Trustees shall divide the trust estate into two separate trusts, one of the trusts to consist of one-half (½) of the trust estate to be held by the Trustees for the benefit of Settlor's daughter, ARLA AVERY McMILLAN, and one of the trusts to consist of one-half (½) of the trust estate to be held by the Trustees for the benefit of WILLIAM BENTON McMILLAN, the husband of Settlor's daughter, ARLA AVERY McMILLAN.

The agreement proceeded to provide that:

1. The Trustees shall pay over and distribute to the Settlor's daughter, ARLA AVERY McMILLAN, so long as she shall live, all of the net income derived from that certain trust consisting of one-half (½) of the trust estate so held by the Trustees for her benefit. * * *

with similar provision for the payment to William Benton McMillan so long as he shall live of all of the net income derived "from that certain trust consisting of one-half (½) of the trust estate so held by the Trustees for his benefit."

We conclude that for the purposes of the gift tax statutes and for valuation there were four separate gifts, each consisting of 6,500 shares of Montgomery Ward stock and 4,000 shares of Gypsum stock. This conclusion, however, does not entail the consequence urged by respondent that such blocks of stock should be valued as though sold in one day on the open market. We are of the opinion, and the record supports the conclusion, that either secondary distribution or sales over a reasonable period of time after the basic date would have been resorted to to dispose of blocks of stock of the size of the four gifts here in question. To have offered it on the open market in one day would have demoralized the market.

We have indicated in our findings the values of the stocks on the basic date, which values will be used in the computation consequent on this opinion. In arriving at these figures we have given due weight to the trend of prices, the various theories of valuation submitted, and the experience of other vendors making comparable offerings as shown by the record, as well as to the opinion evidence as to values.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DISNEY, *J.*, dissents.

———

MURDOCK, *J.*, dissenting: The question here is the value of the gifts which the petitioner made on December 31, 1940. These gifts were in Ward and Gypsum shares, so that the real problem is to determine the value of those shares comprising the gifts. Cf. *John J. Newberry*,

39 B. T. A. 1123. The Commissioner has determined a value by multiplying the number of shares given by the mean of the high and low at which similar shares sold on the stock exchange on the day in question. The petitioner points to the size of the blocks which he gave and says that he could not have obtained the market price of that day for shares in that quantity on the day of the gift. The approach to the question adopted by the majority is to determine how much the donor could have obtained for the shares by a sale on the day of the gift. The obvious, though unstated, conclusion is that he would have marketed them by secondary distribution at a cost of from $1 to $2 a share and the fair market values of the gifts are the net prices which the petitioner would have received had he sold the stock by secondary distribution on the basic date. This substitutes a new and, to my mind, one-sided rule for the time-tested and satisfactory rule which was stated many years ago and has since been followed in innumerable cases.

Fair market value, for present purposes, has been defined as the price at which property would pass from a seller, willing but under no compulsion to sell, to a buyer, able, willing, but under no compulsion to buy, where each has reasonable knowledge of the facts. See Mertens Law of Federal Income. Taxation, vol. 10, sec. 59.02, p. 440 *et seq.; John J. Newberry, supra,* and cases therein cited. The existence of both of these imaginary people must be assumed, and the problem, difficult at best, is to determine the price upon which they would have agreed. The present opinion ignores this rule and considers the question entirely from the standpoint of the seller, apparently a seller who was forced to sell all of the shares on one day, December 31. 1940. and inferentially demands proof of the existence of a willing buyer or buyers. The fact of the matter is that Avery had no desire to sell these shares, and, since compulsion is expressly excluded in the definition, we certainly may not assume that he was forced to sell them. Incidentally, if it were pertinent to inquire how much he could have obtained for his shares on the date of the gift, then it would seem to be equally pertinent to inquire how much money a purchaser would have been required to use had he been under compulsion to buy that many shares on that day. Perhaps it would have cost such a purchaser even more than the current market figures adopted by the Commissioner. Such an examination of both sides of the problem helps to demonstrate the propriety of the old rule of willing buyer and willing seller.

The Commissioner, in order to determine the price at which such shares would have passed between a willing buyer and a willing seller, has gone to the stock exchange, the principal market where similar shares actually passed between willing buyers and willing sellers. The findings show that the market was not being manipulated

and, indeed, the parties have stipulated that the prices on that market were the fair market values of the lots sold there. Actual sales on open market are generally the best evidence of fair market value, although other evidence may sometimes establish a different value. *John J. Newberry, supra,* and cases cited therein. Thus, the action of the Commissioner seems reasonable under the circumstances of this case, yet a one-sided approach in the majority opinion has led to a rejection of actual sales as the best evidence of fair market value in this case.

The value determined for the gift of the Gypsum stock is the same as that determined by the Commissioner, but the value of the Ward shares is reduced. Even if value were to be established by determining the amount for which Avery could have sold the shares on December 31, 1940, this report would seem to be at fault. There is a finding that "the stock would have been disposed of through a secondary distribution or by sale in small lots over a period of time." The possibility of sale in small lots over a period of time is not discussed, but there is a further finding that the secondary distribution method would be less subject to speculative fluctuations. This is not sufficient. In the case of *Henry F. du Pont,* 2 T. C. 246, we apparently assumed that at least 90 days would have been a reasonable period within which to dispose of much larger blocks of stock. There is no showing here that the Ward stock could not have been disposed of within 90 days at prices at least equal to the value determined by the Commissioner. The Ward shares were widely held. It was one of the most active stocks on the exchange. Although the general tendency throughout 1940 had been downward, nevertheless, the tendency at December 31, 1940, and for some time thereafter was upward. The blocks given were not large compared to the number of shares sold within 90 days of the date of this gift. Finally, it appears that the finding of the value of $36.50 per share for the Ward stock was arrived at by deducting a commission for the broker or brokers who would act as secondary distributors for the stock. Never, so far as I know, has it been held that fair market value of a gift is determined by taking the current market price of similar property and subtracting the expenses of a sale. Where, as here, the donor had no intention or desire to sell the shares or to have the donees sell them, there would appear to be no justification for deducting any of the possible costs of sales such as commissions.

STERNHAGEN, TURNER, ARNOLD, KERN, and OPPER, *JJ.*, agree with this dissent.