Murdock, J., dissenting: The question here is the value of the gifts which the petitioner made on December 31, 1940. These gifts were in Ward and Gypsum shares, so that the real problem is to determine the value of those shares comprising the gifts. Cf. John J. Newberry, 39 B. T. A. 1123. The Commissioner has determined a value by multiplying the number of shares given by the mean of the high and low at which similar shares sold on the stock exchange on the day in question. The petitioner points to the size of the blocks which he gave and says that he could not have obtained the market price of that day for shares in that quantity on the day of the gift. The approach to the question adopted by the majority is to determine how much the donor could have obtained for the shares by a sale on the day of the gift. The obvious, though unstated, conclusion is that he would have marketed them by secondary distribution at a cost of from $1 to $2 a share and the fair market values of the gifts are the net prices which the petitioner would have received had he sold the stock by secondary distribution on the basic date. This substitutes a new and, to my mind, one-sided rule for the time-tested and satisfactory rule which was stated many years ago and has since been followed in innumerable cases. Fair market value, for present purposes, has been defined as the price at which property would pass from a seller, willing but under no compulsion to sell, to a buyer, able, willing, but under no compulsion to buy, where each has reasonable knowledge of the facts. See Mertens Law of Federal Income, Taxation, vol. 10, sec. 59.02, p. 440 et seq.; John J. Newberry, supra, and cases therein cited. The existence of both of these imaginary people must be assumed, and the problem, difficult at best, is to determine the price upon which they would have agreed. The present opinion ignores this rule and considers the question entirely from the standpoint of the seller, apparently a seller who was forced to sell all of the shares on one day, December 31. 1940. and inferentially demands proof of the existence of a willing buyer or buyers. The fact of the matter is that Avery had no desire to sell these shares, and, since compulsion is expressly excluded in the definition, we certainly may not assume that he was forced to sell them. Incidentally, if it were pertinent to inquire how much he could have obtained for his shares on the date of the gift, then it would seem to be equally pertinent to inquire how much money a purchaser would have been required to use had he been under compulsion to buy that many shares on that day. Perhaps it would have cost such a purchaser even more than the current market figures adopted by the Commissioner. Such an examination of both sides of the problem helps to demonstrate the propriety of the old rule of willing buyer and willing seller. The Commissioner, in order to determine the price at which such shares would have passed between a willing buyer and a willing seller, has gone to the stock exchange, the principal market where similar shares actually passed between willing buyers and willing sellers. The findings show that the market was not being manipulated and, indeed, the parties have stipulated that the prices on that market were the fair market values of the lots sold there. Actual sales on open market are generally the best evidence of fair market value, although other evidence may sometimes establish a different value. John J. Newberry, supra, and cases cited therein. Thus, the action of the Commissioner seems reasonable under the circumstances of this case, yet a one-sided approach in the majority opinion has led to a rejection of actual sales as the best evidence of fair market value in thi's case. The value determined for the gift of the Gypsum stock is the same as that determined by the Commissioner, but the value of the Ward shares is reduced. Even if value were to be established by determining the amount for which Avery could have sold the shares-on December 31, 1940, this report would seem to be at fault. There is a finding that “the stock would have been disposed of through a secondary distribution or by sale in small lots over a period of time.” The possibility of sale in small lots over a period of time is not discussed, but there is a further finding that the secondary distribution method would be less subject to speculative fluctuations. This is not sufficient. In the case of Henry F. du Pont, 2 T. C. 246, we apparently assumed that at least 90 days would have been a reasonable period within which to dispose of much larger blocks of stock. There is no showing here that the Ward stock could not have been disposed of within 90 days at prices at least equal to the value determined by the Commissioner. The Ward shares were widely held. It was one of the most active stocks on the exchange. Although the general tendency throughout 1940 had been downward, nevertheless, the tendency at December 31, 1940, and for some time thereafter was upward. The blocks giVen were not large compared to the number of shares sold within 90 days of the date of this gift. Finally, it appears that the finding of the value of $36.50 per share for the Ward stock was arrived at by deducting a commission for the broker or brokers who would act as secondary distributors for the stock. Never, so far as I know, has it been held that fair market value of a gift is determined by taking the current market price of similar property and subtracting the-expenses of a sale. Where, as here, the donor had no intention or desire to sell the shares or to have the donees sell them, there would appear to be no justification for deducting any of the possible costs of sales such as commissions. Sternhagen, Turner, Arnold, Keen, and Offer, JJ., agree with this dissent.