Estate of William Maxwell, deceased, The Hartford-Connecticut Trust Company and Frederick N. Belding, Executors v. Commissioner.
Estate of Maxwell v. Commissioner
Docket No. 3178.
United States Tax Court
1944 Tax Ct. Memo LEXIS 54; 3 T.C.M. (CCH) 1207; T.C.M. (RIA) 44366; November 3, 1944
*54 Charles W. McConaughy, Esq., and Clarence Castimore, Esq., 14 Wall St., New York 5, N. Y., for the petitioners. Charles P. Reilly, Esq., for the respondent. STERNHAGEN The Commissioner determined a deficiency of $176,119.86 in estate tax. The petitioners assail the determination of the Commissioner (1) of the fair market value of certain corporate shares; (2) including in gross estate six insurance policies at a total value of $274,055.41 transferred in trust December 19, 1935; and (3) including in gross estate $87,000, being the total amount of additional gifts made in November, 1937, and December, 1938, to six separate trusts created December 16, 1935. Findings of Fact The petitioners are the executors of the estate of William Maxwell, who died testate on July 27, 1939, a resident of Rockville, Connecticut. The estate tax return was filed at Hartford, Connecticut. The executors elected under Section 811(j), Internal Revenue Code, to have the gross estate valued as of July 27, 1940, one year after death. A net estate of $3,337,091.58 was reported. The tax thereon of $883,519.51 was paid October 23, 1940. On September 23, 1942, an additional tax of $64,075.02 was paid, together *55 with interest of $7,364.24. 1. Included in the gross estate were corporate shares as follows: Shares
855
Hartford-Connecticut Trust Co.
1,000
Hartford Steam Boiler Inspection and
Insurance Co.
12,000
National Fire Insurance Co.
1,143
Travelers Insurance Co.
10,000
Hartford Fire Insurance Co.
1,500
Hartford Fire Insurance Co.
10,256
Raymond Concrete Pile Co.
(a) The Hartford-Connecticut Trust Co., a Connecticut banking corporation located in Hartford, Connecticut, had 160,000 common shares outstanding in 1940, held by about 2,945 persons. A dividend of $3 a share had been paid for at least 10 years. The shares are not listed on any exchange. The market is limited almost entirely to Hartford. The normal trading unit is 10 shares. On July 27, 1940, quotations in the Hartford newspapers were 68 bid and 73 asked. Monthly over-the-counter quotations after July, 1940, were: Bid
Asked
August
68
73
September
69
74
October
70
73
November
69
72
December
68
71 A Hartford dealer sold some shares at 71 on August 16, 1940, and at 72 on September 13 and 30, 1940. The fair market value of the 855 shares of Hartford-Connecticut Trust Co. on July 27, 1940, was $70.50 *56 a share, or $60,277.50. (b) The Hartford Steam Boiler Inspection and Insurance Co. in 1940 had 300,000 common shares outstanding, held by approximately 2,121 persons. They are not listed on any exchange. The normal trading unit is 25 to 50 shares. A Hartford dealer sold 4,031 shares during 1940, at an unstated price. The over-the-counter quotation on July 27, 1940, was 51 3/4 bid, and 53 3/4 asked. Later weekly over-the-counter quotations were: Bid
Asked
July 27-Aug. 2
52
54
Aug. 3- 9
51 1/2
53 1/2
10-16
49 1/2
51 1/2
17-23
50
52
24-30
50
52
31-Sept. 6
52
54
Sept. 7-13
52
54
14-20
53
55
21-27
55
56
28-Oct. 4
55
57 The fair market value of 1,000 shares of Hartford Steam Boiler Inspection and Insurance Co. on July 27, 1940, was $52.75 per share, or $52,750. (c) The National Fire Insurance Co. had 500,000 common shares outstanding in 1940, held by approximately 4,672 persons. They are not listed or sold on any exchange. The normal trading unit is 25 to 50 shares. In 1940, a New York dealer sold around 10,000 shares and a Hartford dealer sold 3,829. The over-the-counter quotation on July 27, 1940, was 53 1/2 bid, and 55 1/2 asked. Later weekly over-the-counter *57 quotations were: Bid
Asked
July 27-Aug. 2
53 1/4
55 1/4
Aug. 3- 9
53
55
10-16
52 1/2
54 1/2
17-23
52 1/2
54 1/2
24-30
52 1/4
54 1/4
31-Sept. 6
54 1/4
56 1/4
Sept. 7-13
53 3/4
55 3/4
14-20
55 3/4
57 3/4
21-27
53 1/2
55 1/2
28-Oct. 4
54 3/4
56 3/4 At the time of his death the decedent owned 18,140 shares of which the executors sold 6,140 shares during October, 1939, as follows: Quotations
Shares
Price
Bid
Asked
Oct. 11
2,000
59 1/8
58 1/4
60 1/4
13
1,000
59 1/4
58 1/4
60 1/4
19
2,000
59 1/4
59 1/2
61 1/2
24
1,000
59 1/8
59 1/4
61 1/4
31
140
60 The fair market value on July 27, 1940, of 12,000 shares of National Fire Insurance Co. was $54.50 a share, or $654,000. (d) Travelers Insurance Co. had outstanding 200,000 shares held by about 8,696 persons. They are not listed or sold on any exchange. The normal trading unit is 1 to 5 shares. During 1940, a Hartford dealer sold 2,722 shares. This dealer on February 24, 1941, purchased a block of 3,230 shares at $380 per share and offered it to the public on the same day at $400 a share. They were sold. The over-the-counter quotation on July 27, 1940, was 401 bid, *58 and 411 asked. Later weekly over-the-counter quotations were: Bid
Asked
July 27-Aug. 2
404
414
Aug. 3- 9
407
417
10-16
396
406
17-23
396
406
24-30
398
408
31-Sept. 6
408
418
Sept. 7-13
408
418
14-20
410
420
21-27
409
419
28-Oct. 4
415
425 The fair market value of 1,143 shares of Travelers Insurance Co. on July 27, 1940, was $406 a share, or $464,058. (e) At the time of his death William Maxwell owned 15,000 shares of Hartford Fire Insurance Co. On December 13, 1939, 10,000 shares were distributed at 73 a share to legatees under his will. On October 6, 1939, 3,000 shares were sold by the estate at 76 1/2 a share, when the over-the-counter quotation was 78 bid, and 81 asked. On October 27, 1939, 500 shares were sold by the estate at 78, when the over-the-counter quotation was 77 bid and 80 asked. On July 27, 1940, the estate held 1,500 shares. Hartford Fire Insurance Co. had 1,200,000 shares outstanding on December 31, 1939, held by about 11,538 persons. They were not listed on any exchange. The normal trading unit is 25 to 50 shares. A New York dealer sold about 20,000 shares during 1939 and 1940 and a Hartford dealer sold 9,925 shares in 1940. *59 The earnings for 1939 were $4.71 a share ($7.71 a share on a consolidated basis with wholly owned subsidiaries) and for 1940, $5.35 ($7.34, consolidated). Dividends of $2.50 a share were paid in 1939 and 1940, and $2 in 1936, 1937 and 1938. The over-the-counter quotation on December 13, 1939, was 82 3/4 bid, 83 1/2 asked, and on July 27, 1940, 74 1/2 bid and 76 1/2 asked. The weekly quotations during December, 1939, were: Week
Ending
Bid
Asked
Dec. 1
83 1/2
86 1/2
8
83 1/2
86 1/2
15
78 1/2
81 1/2
22
82
85
29
82 1/2
85 1/2 Weekly quotations beginning in July, 1940, were: Bid
Asked
June 29-July 5
72 3/4
74 3/4
July 6-12
72 3/4
74 3/4
13-19
73 3/4
75 3/4
20-26
74 1/2
76 1/2
27-Aug. 2
75
78
Aug. 3- 9
77
80
10-16
75
78
17-23
76 1/2
79 1/2
24-30
78
81
31-Sept. 6
81 1/2
84 1/2
Sept. 7-13
80
83
14-20
83 1/2
86 1/2
21-27
82 1/2
85 1/2
28-Oct. 4
82
85 The fair market value of 10,000 shares of Hartford Fire Insurance Co. on December 13, 1939, was $80 per share, or $800,000, and the fair market value of 1,500 shares of the same company on July 27, 1940, was $75.50 per share, or $113,250. (f) The Raymond Concrete Pile Company makes *60 concrete piles for bridges, piers and building foundations. The business involves risk and the shares are speculative. In 1940, the company had about 184,694 no-par common shares outstanding, held by about 500 persons. It also had about 22,500 shares $3 preferred outstanding on which the $3 dividend was being paid regularly. At the end of 1939 the book value of the common was $8.93 a share. On the common shares, dividends were paid of $2 in 1937, $1 in 1938, $.75 in 1939, and $.25 in 1940. About 26,000 common shares were sold on the Curb Exchange in 1938, 18,250 in 1939, and 13,950 in 1940. In 1939, the price ranged from a low of 12 to a high of 21, and in 1940 from a low of 6 7/8 to a high of 17 1/2. On July 27, 1940, there were no sales and the common was quoted at 11 3/4. On July 26, 1940, it was quoted at 12 high and 11 low, with a volume of 150 shares, the last sale being at 11. The number of shares traded in on the Curb was about 450 in June, 1940, 950 in July and 300 in August. The weekly sales and quotations from June 29, 1940, were: Shares
Low
High
June 29-July 5
50
8 1/4
8 1/4
July 6-12
400
10
11 5/8
13-19
350
11 1/2
12
20-26
150
11
12
27-Aug. 2
100
11 3/4
11 3/4
Aug. 3- 9
100
11
11 3/4
10-16
100
11
11
17-23
no sales
24-30
no sales
31-Sept. 6
450
11 1/2
11 7/8
Sept. 7-13
no sales
14-20
350
9 3/4
11
21-27
450
11 1/8
11 3/4
28-Oct. 4
1,100
11 1/2
13 1/2
*61 The fair market value of 10,256 shares of Raymond Concrete Pile Co. on July 27, 1940, was $10.50 a share, or $107,688. 2. The decedent was born December 7, 1862, was of a long-lived family, and never married. He liked to travel, took many ocean voyages, his last in May, 1937. In 1934, after retiring from active participation in the business of a mill, he established a personal office near his home, to which he went regularly for a few hours a day. He was a director in several corporations until shortly before his death. Until the spring of 1939 he kept an apartment in a hotel in New York City, where he spent every week end. In 1934 or 1935, he began consulting physicians, first for shortness of breath. His heart and blood pressure were found to be in good condition. In 1935, he had two operations for cataract. In July, 1937, he was found to have advanced pulmonary emphysema, which he had for several years. The difficulty in breathing and shortness of breath were to some extent attributable to bronchitis, first in 1928 and again in 1933, and was progressively severe until July, 1937. Decedent then went to a hospital in New York and took oxygen treatments. Because oxygen afforded him *62 relief, he had a portable oxygen chamber installed in his home, had a nurse, and spent 16 or 17 hours of each day in the oxygen room. When in New York, he spent much time in the oxygen room at the hospital and went out only about four or five hours a day. This continued until his death. He knew about the emphysema, but he was not worried about it or about his health generally. In April, 1939, decedent had a prostate operation, and thereafter carried a drainage tube. The clogging of the tube several months later caused an infection and pyelo-nephritis, which was the cause of his death in July. (a) Decendent's next of kin were an older unmarried sister, J. Alice Maxwell, and an older brother, Francis T. Maxwell, both of whom outlived him but are now dead. The brother had three daughters: Harriett Maxwell Holbrook (now Veissi), who had no children; Priscilla Maxwell Endicott, whose two children are Bradford Endicott, born October 14, 1926, and Priscilla Endicott, born April 24, 1929; and Helen Maxwell Belding, deceased, whose two children are Maxwell Belding, born March 30, 1922, and Virginia Belding, born March 11, 1924. On October 15, 1931, decedent created a revocable trust, of *63 which J. Alice Maxwell, Francis T. Maxwell and Hartford-Connecticut Trust Company were named trustees, and to which he transferred six paid up insurance policies on his life: Number
P-354437
Aetna Life Insurance Co.
20-payment endowment maturing at age 85
$50,000
P-434715
Aetna Life Insurance Co.
20-payment endowment maturing at age 85
50,000
796862
Equitable Life Assurance Co.
20-payment life
73,549
1147450
Mutual Benefit Life Ins. Co.
Single premium paid up life
13,784
1147451
Mutual Benefit Life Ins. Co.
10-payment life
11,000
847134
Northwestern Mutual Life Ins. Co.
20-payment life
100,000 The trustees were then designated beneficiaries under the policies. Under the trust indenture, two-thirds of the net income was to be paid to J. Alice Maxwell and one-third to Francis T. Maxwell during their joint lives, and, after the death of either, the entire net income to the survivor. Upon the death of the survivor of the donor, J. Alice Maxwell and Francis T. Maxwell, the remainder was to be divided into seven parts to be disposed of, two parts to Priscilla Maxwell Endicott or, if then deceased, to her descendants per stirpes; three parts to be held in trust *64 for Harriett Maxwell Holbrook during her life, the net income to be paid to her during her life, and the remainder to be distributed upon her death to her descendants then living; and one part each to be held in trust for and the income thereof to be paid to Virginia Belding and Maxwell Belding until they arrived at the age of 30 years, at which time the trust funds were to be distributed to them. The indenture also contained the following: "WHEREAS, the Trustees have undertaken to use due diligence to collect such proceeds and to hold and administer the same as a trust fund in accordance with the terms of this Indenture: "SIXTH: * * * The Donor shall not be deemed as a result of this Indenture to have relinquished any of the rights or privileges given to him in said policies or allowed by the insurers during his life. * * * "SEVENTH: The Donor may revoke this Indenture upon delivering written notice to the Trustees and may amend this Indenture by an instrument executed by him and the Trustees. * * *" The trust indenture was amended on June 27, 1932, by changing the distribution of the remainder after the death, of the survivor of the primary three. The remainder was to be divided *65 into 10 equal parts, of which (A) three parts were to be distributed to Priscilla Maxwell or, if then deceased, to her descendants then living per stirpes and failing descendants, to be added to trusts created in Sections B and C; (B) four parts to be held for the benefit of Harriett Maxwell Holbrook during her life, the net income thereof to be paid to her, and upon her death the remainder to be distributed to her descendants or failing such descendants, to the descendants then living of Francis T. Maxwell; and (C) three parts to be divided into two equal shares to be held for Virginia Belding and Maxwell Belding, the income from one share to be paid to each until the age of 30 years was reached, at which time the principal of one share was to be distributed to each of them, if living, if not, to their descendants, failing descendants to the survivor of them. The trust indenture was again amended May 4, 1938, changing the compensation payable to trustee. Prior to December 1, 1935, the six policies were withdrawn by decedent from the trust of October 15, 1931. On or about December 16, 1935, decedent changed the insurance beneficiary and named his estate instead of the three *66 trustees under the 1931 trust, except policy P-434715 for $50,000. This policy was divided in two, one for $40,000 being left in the old trust and the other for $10,000, naming the insured as life beneficiary. Under date of December 19, 1935, decedent executed an irrevocable trust indenture in which The Hartford-Connecticut Trust Company was named trustee, his sister and brother were named life beneficiaries and, upon the death of the survivor of the three, the remainder was distributable to the children and grandchildren of the brother in the same proportions and manner as provided in the earlier trust indenture. All the beneficiaries survived the donor. The trust provisions were substantially similar to the earlier trust, as amended, and in addition the trust indenture provided: "THIRD: Any funds which may come into the hands of the Trustee under the insurance policies by so-called dividends or otherwise, prior to the death of the Donor, shall be invested and reinvested as principal under the terms of this Indenture and administered as though the Donor had already died." On or before December 19, 1935, all the policies except the $40,000 policy left in the old trust were assigned *67 absolutely by decedent to the trustee under the 1935 irrevocable trust. All the policies were paid up prior to December 19, 1935. Prior to the death of decedent, the trustees of the 1935 trust received returns of premiums or dividends in the amount of $4,665.10 which they invested and the income of which they paid to J. Alice Maxwell and Francis T. Maxwell. After decedent's death, the trustee of the 1935 trust received on the six policies a total amount of $274,055.41. This was not included by the executors in the reported gross estate, and was included by the Commissioner. The decedent made a will on February 8, 1936, and thereby disposed of his large estate leaving most of it to the same relatives as he named as beneficiaries in the aforesaid trusts. The transfer of the six insurance policies made to the trust December 19, 1935, was made in contemplation of death. (b) Under date of December 16, 1935, decedent executed six separate irrevocable trust indentures for the benefit of his two nieces and his four grandnieces and grandnephews, transferring to the trustee for each trust $4,500 in cash. Under the trust indenture for each niece, the net income was payable to her during *68 life and upon her death the remainder was payable to her descendants per stirpes or, failing such descendants, to the descendants of Francis T. Maxwell per stirpes living at the time of such payment. In each trust for the grandnieces and grandnephews, the trustee was directed to accumulate and reinvest as principal the income until the beneficiary reached the age of 21, at which time the net income was to be paid to the beneficiary until he or she attained the age of 30 years, at which time half of the corpus was to be distributed, and the remaining half when the beneficiary attained the age of 35 years. If the beneficiary died before the termination of the trust, the funds were payable to his or her children and, on the failure of the children, then per stirpes to the descendants then living of Francis T. Maxwell. Decedent made additional gifts to each of the six trusts as follows: December 15, 1936, $4,500; November 5, 1937, $4,500, and December 15, 1938, $10,000, which were received and invested by the trustee. The net income of the trusts for the two nieces was paid to them, but the income of the four trusts for the grandnieces and grandnephews, who were minors, *69 was accumulated by the trustee and invested. The amounts of these gifts were not included by the executors in the reported gross estate, and the Commissioner included the amount of the gifts made to the six trusts on November 5, 1937, and December 15, 1938, aggregating $87,000. The transfers aggregating $87,000 made by decedent on November 5, 1937, and December 15, 1937, were made in contemplation of death. A gift tax return was filed by William Maxwell in which the 1935 gifts of the insurance policies and cash were reported. The value of the insurance policies was reported as $228,083.93, which value was subsequently increased by the Commissioner to $240,612.35. The gift tax originally paid was $10,327.55 and on July 12, 1939, a deficiency in gift taxes of $1,577.56 was paid. Opinion STERNHAGEN, Judge: 1. The valuation of the several blocks of shares owned directly by the decedent at the time of his death was raised by the Commissioner to the mean of the published quotations. The petitioners, at the trial and in their brief, concede that the valuations which they used were too low and may properly be raised, but not as high as the Commissioner's determination. They say the Commissioner's *70 valuations give inadequate effect to "blockage" and that they erroneously adopt the quotations of small blocks as unit figures for the larger blocks in question. To support their position, their evidence consists of the opinions of four security dealers familiar with the market in the shares; while the respondent merely proved that the valuations used (except one) were taken from published quotations. The essential dispute is whether a so-called "blockage rule" should be applied, and the resulting valuation. While the opinions of witnesses who are experienced in general in the securities market and in particular in the market of the securities in question may be a factor of valuation and are admissible and therefore to be considered by the Court, such evidence is not controlling, and the Court is not bound to determine the value strictly in accordance with such opinions. Helvering v. Safe Deposit & Trust Co. of Baltimore, 95 Fed. (2d) 806; Bull v. Smith, 119 Fed. (2d) 490; Helvering v. Maytag, 125 Fed (2d) 55; Mott v. Commissioner, 139 Fed. (2d) 317; Henry F. DuPont, 2 T.C. 246, 256. *71 More especially in this case the fair market value between willing sellers and willing buyers is not demonstrated by what a dealer would hypothetically be willing to pay for the securities upon the assumption that he would thereafter sell them at a higher price to the investing purchaser either by direct sale or through a process of secondary distribution. The use of such testimony as to a method of valuation in wholesale transactions was disapproved in the Board's opinion in the Mott case (affirmed by the Circuit Court of Appeals for the Sixth Circuit) and cannot be accepted here as a controlling theory of decision. It is an anomaly to say that a price offered by a dealer below the retail or ultimate sale value which he expects to receive from the investing public determines the value. (a) Upon all the evidence tending to affect the value on July 27, 1940, of the 855 shares of Hartford-Connecticut Trust Co., it has been found as a fact that such fair market value was $60,277.50, or $70.50 a share. This is the mean between published quotations of 68 bid and 73 asked. There were no sales on that date. The executors in the return used a valuation of $64.50 and now claim a valuation *72 of $66. The Commissioner's valuation at $71.50 is apparently an inadvertent departure from the habitual mean used by him under the regulations. (b) The value on July 27, 1940, of the 1,000 shares of The Hartford Steam Boiler Inspection and Insurance Co. has been found as a fact to be $52,750, or $52.75 a share. This is the mean between the current quotations of 51 3/4 bid and 53 3/4 asked. In their return, the executors used a valuation of 48 and now claim 49; and the Commissioner used the mean of $52.75. Over 4,000 shares were sold in 1940, but the evidence does not disclose the price or prices. (c) For the 12,000 shares of National Fire Insurance Co. the value on July 27, 1940, has been found as a fact to be $654,000, or $54.50 a share. Approximately this number of shares were actually sold on the market by two dealers in 1940, and this is the mean quotation on the day in question used by the Commissioner. 6,140 shares were sold by the executors in the previous October at a higher price. The executors used a value of 47 on the return. (d) The 1,143 shares of Travelers Insurance Co. have been found as a fact to have had a fair market value on July 27, 1940, of $464,058, or $406 *73 a share. This is the quotation mean between 401 bid and 411 asked on that date as used by the Commissioner, instead of the 345 used by the executors on the return and the 365 now conceded by them. While the quotations varied widely from time to time in 1939 and 1940, there were nevertheless enough sales shown by the evidence to indicate that the market was not stagnant. The quotations were fairly representative of value and showed that July 27, 1940, was not inconsistent with the trend. (e) Since 10,000 shares of Hartford Fire Insurance Co. were distributed by the executor to the legatees on December 13, 1939, the date of valuation is the time of distribution. Section 811 (j), Internal Revenue Code. In the return, the value used for these 10,000 shares was 73. The executors now concede that this was too low, and claim a valuation of 75. The Commissioner used a valuation of 83 1/4. The mean of the quotations of that week was 80, which represented a low of 78 1/2 bid and a high of 81 1/2 asked. These quotations are not explained in the evidence and, although they are mathematically inconsistent with the earlier and later quotations, there is no reason why they should not be regarded *74 as a reflection of value during that week. The Commissioner offers no explanation for his departure from his customary practice of using the mean of the quotations and we see nothing in the evidence to justify it. The value found as a fact therefore is $800,000, based on a unit of 80. The remaining 1,500 shares of Hartford Fire Insurance Co. continued to be held by the executors and their fair market value on July 27, 1940, has been found as a fact to be $113,250, or $75.50. This is less than the mean between the week's quotations of 75 bid and 78 asked, but it is the value which the Commissioner requests as a finding. The market was active enough to carry sales of almost 10,000 shares by one dealer in 1940, and the curve of quotations in 1940 was upward. We see no support in the evidence for a lower valuation as requested by the petitioners. (f) The fair market value of 10,256 shares of Raymond Concrete Pile Co. on July 27, 1940, has been found as a fact to be $107,688, or $10.50 a share. The executors used a unit valuation of 7 on their return, and now concede that this figure was too low and may properly be raised to 9 1/2. The Commissioner used 11, which is lower than the current *75 quotation of the week and equal to the low of the week before. Sales were sporadic and in small amounts. Book value was $8.93, and dividends were in decreasing amounts. We think the Commissioner's valuation was higher than the evidence warrants, and that the correct valuation is $10.50 per share, as found. 2(a). The Commissioner's determination of the gross estate includes the $274,055.41 proceeds as the value of the six life insurance policies which were received by the trustee by virtue of the assignment and the trust of December 19, 1935. The determination was based upon the holding that the transfers had been made in contemplation of death and/or to take effect in possession or enjoyment at or after death. This determination the executors assail. The question whether the transfers on December 19, 1935, were made in contemplation of death is a question of fact. Since they were made more than two years before death, they were not affected by the statutory presumption of Section 811(c); but since the Commissioner has determined that they were made in contemplation of death, the taxpayer who assails the determination must prove the contrary, no less than if the two-year presumption *76 were applicable. This, the executors have undertaken to do; but the evidence, in our opinion, leaves the ultimate fact no more certainly in their favor than it was before, and requires the decision that, since the contrary of the determination has not been proven, the determination is correct. It has therefore been found as a fact that the transfer of the six insurance policies was made in contemplation of death. There is no direct evidence as to the transferor's motive or state of mind at the time he transferred these policies, and from the circumstances it cannot reasonably be inferred that the transfers were not made in contemplation of death. No other motive or purpose of the decedent is shown by the evidence. Decedent was an elderly man, who had been in ill health for some time, not latently but to his knowledge. In 1935, he had had two attacks of bronchitis and his medical adviser thought his respiratory difficulty was attributable to his heart. There is apparently no significance in the cataract operations in January, 1935; or in the fact that decedent was a man of cheerful disposition and was not given to discuss his health. These facts are neutral. The difficulty of breathing, *77 which according to one specialist was in 1937 found to have been going on for three years, was diagnosed as emphysema, was to some extent attributable to the earlier bronchitis, and became serious enough in 1937 to require the oxygen room in which he spent 16 or 17 hours a day. It may be that upon proper proof it could have been found as a fact that notwithstanding these circumstances the decedent's conduct and his transfers of property were not in contemplation of death. But clearly, without such proof no such finding could be supported, and the Commissioner's determination is not overcome. Since the decedent was a bachelor and had no impecunious relatives whom he was required to support or who were importuning him for support or gifts, there is nothing upon which to base an inference of a motive different from the one the Commissioner has determined. The fact that the 1935 trust was made contemporaneously with similar trusts being made by his older sister and brother may be some indication that there was a "family plan" as the petitioners suggest, but such a plan would not be inconsistent with contemplation of death. Indeed, it would be just as reasonable to infer that such a plan *78 was itself a factor of the decedent's intended disposition at his death. It is more reasonable to believe that in fact the transfers were made in contemplation of death. The transfers were paid up insurance policies, which were to be effective only as an incident of decedent's death. This he must have known and had in contemplation when the transfers were made. Death must have been in his mind as the occasion when the gifts would be operative. It is not necessary to consider the statutory provision in respect of transfers to take effect in possession or enjoyment at or after death, even though both provisions may in a proper case apply to the same transfer. (b) The executors upon the same general grounds assail the Commissioner's inclusion of the $87,000 transferred by the decedent to the six trusts for his nieces and grandnieces and grandnephews on November 5, 1937, and December 15, 1938. These transfers were also determined to have been made in contemplation of death. They were made within two years prior to death, and are therefore affected by the statutory presumption. However, since the value of the entire estate was about $4,000,000 there is a question whether gifts amounting *79 to $87,000 can be said to be a "material" part of the estate making the presumption applicable. That, however, does not require decision since the evidence in any event does not show that in fact the transfers were not made in contemplation of death as the Commissioner has determined, but adequately supports an affirmative inference that they were made in contemplation. If there were any doubt as to whether the transfers of the insurance policies in 1935 were in contemplation of death, the conditions of decedent's health and his realization thereof in 1937 and 1938 were clearly indicative of a state of mind that includes the contemplation of his death when he made these transfers to the six trusts. By that time he had begun to spend a large part of every day in an oxygen room and it is impossible to suppose that, at his age of 75 and with his recent experience, he made these gifts with no thought of death. The Commissioner's determination to that effect is therefore sustained. In view of our consideration of the contemplation of death issue as to both transfers upon the evidence, it has seemed unnecessary to discuss other questions debated by the parties, such as the validity of *80 the withdrawal of the insurance policies from the earlier revocable trust and putting them in the later, and the applicability of Section 811 (g). Decision will be entered under Rule 50.