HAVEMEYER v. UNITED STATES.

No. 45775.

Court of Claims.

April 2, 1945.

Preston B. Kavanagh, of Washington, D. C. (William M. Sperry, 2nd, of New York City, on the brief), for plaintiff.

Francis T. Donahoe, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Fred K. Dyar and John A. Rees, both

of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

LITTLETON, Judge.

The two principal questions presented are whether, for the purpose of the gift tax, a taxpayer may submit evidence to prove that the actual fair market value of a large block of stock of a corporation made the subject of a gift on a certain date is less on the date of the gift than the mean between the highest and lowest selling prices of a comparatively small number of shares of such stock on the Stock Exchange on such date; and, if so, the fair market value of the shares of such large block of stock under all the circumstances and conditions affecting or having a material bearing upon such market value or price at which such stock could have been disposed of on the date of the gift to the best advantage.

A third question is whether, for the purpose of obtaining a refund of an overpayment of a gift tax paid in 1935 in respect of a gift made in 1934, a claim for refund therefor must be filed within three years from the date in 1935 on which such tax was paid; or whether the gift tax is such a continuing tax upon the individual, irrespective of when the gifts were made, that the taxpayer may claim and obtain a refund to which he may be entitled in respect of the tax paid in 1935 on the gift in 1934 out of a gift-tax payment in 1938 on other gifts made in 1937, on a refund claim filed within three years of the 1938 payment, but more than three years after the 1935 payment, in respect of which the claimed overpayment is asserted.

This suit was brought to recover an alleged overpayment in 1935 of $244,324.01, with interest, in respect of a gift of stock made by plaintiff in November 1934.

Plaintiff made a gift to and in trust for his four children, among other properties or securities, of 160,000 shares of the common stock of the Great Western Sugar Company and 20,000 shares of the common stock of the South Porto Rico Sugar Company. In making a gift-tax return in 1935 of gifts made during the calendar year 1934 and in computing the gift tax thereon, plaintiff, on this return, valued each share of Great Western stock at $28.-

125, or $4,500,000 for the whole of the 160,000 shares, and each share of South Porto Rico stock at $24.50, or $490,000 for the whole number of 20,000 shares. These values used on the return represented the mean between the highest and lowest quoted selling prices a share of such of the stock of these two corporations as was sold on the New York Stock Exchange on November 19, 1934, the date of the gift. Upon this return of gifts made in 1934, which included gifts other than the stocks mentioned, plaintiff paid on March 14, 1935 a total gift tax of $2,373,878.82. The Treasury made certain adjustments which were not related to the reported values of the stocks here involved and determined a deficiency of $23,433.53 in tax and interest thereon of $3,252.12, totaling $26,685.65. This additional tax and interest was paid July 13, 1934. Claims for refund were filed in 1939 and were rejected in 1940, as set forth in findings 6 to 9, inclusive.

The facts as established by the evidence submitted by plaintiff with reference to the business, earnings, and stock of the Great Western Sugar Company and the South Porto Rico Sugar Company, the daily sales of such stock on the New York Stock Exchange during November 1934, the weekly and monthly sales during other periods, the conditions and circumstances which would have affected the fair market values of the large blocks of stock here involved had these blocks of stock been offered for sale or been sold on the Stock Exchange on the date of the gift, the manner or method by which these large blocks of stock could have been sold or disposed of at one time to the best advantage and at the best prices, and the actual fair market values or prices a share of such blocks of the 160,000 and 20,000 shares, respectively, on the date of the gift, are set forth in findings 10 to 22, inclusive. The largest number of sales of stock of the Great Western Sugar Company on any day during November 1934 was a total of 3,800 shares on November 8, and the total number of shares of this company's stock sold on November 19, the date of the gifts here involved, was 2,500 shares. The total of the daily sales of this stock during the entire month of November 1934 was 27,200 (finding 11).

Likewise, the largest number of sales of the stock of South Porto Rico Sugar Company on any day during November 1934 was a total of 2,500 shares on November 16, and the total number of shares of this

Company's stock sold on November 19 was 900 shares. The total of the daily sales of this stock during the entire month of November 1934 was 18,200 (finding 14).

The facts as set forth in findings 20 and 21 were found by the Commissioner of this Court from all the evidence submitted. The evidence from which those findings are made, and which fully establishes the facts therein set forth, is uncontradicted by any evidence submitted by defendant. The defendant, however, objected at the trial to the introduction by plaintiff of any evidence to establish the facts relied upon by plaintiff, and set forth in said findings 20 and 21, on the ground that such evidence was incompetent and immaterial because the mean between the highest and the lowest selling price of the stock of these two corporations on the New York Stock Exchange on November 19, 1934, the date of gift, established the fair market value a share of the stock of these corporations and should be found and used as the values for the purpose of measuring the gift tax upon the transfer by gift of 160,000 shares of the Great Western Sugar Company and 20,000 shares of the South Porto Rico Sugar Company on November 19. Defendant also takes exception to the report of the Commissioner as to facts found by him and set forth in findings 20 and 21, and to a finding of values as set forth in finding 22 on the ground that these findings "set forth ultimate conclusions of facts which are deemed both improper and unwarranted in that they were based upon assumed facts that were both speculative and contingent and also for the reason that the summary conclusions [of ultimate facts] cannot fairly be said to relate to any issue in this proceeding."

We think defendant's objection to the testimony offered by plaintiff to establish such facts as are set forth in the questioned finding was properly overruled by the Commissioner and that defendant's exception to the findings made by the Commissioner is not well taken. Defendant's objection to the testimony and the findings established thereby is not consistent with the well-established rule of law for determination of fair market value and is not consistent with Treasury Regulations (art. 19 (3), Regs. 79, 1932 Ed.) in effect from the inception of the gift tax to 1936, or with Regs. 108 (sec. 86.19, 1939 Ed.). Defendant's position on its exception in effect attempts to apply the rule which, for a time, the Treasury Department attempted to enforce, as written into art. 19(1), (3), of Regs. 79, 1936 Ed., that listed stocks should be valued at "the mean between the highest and lowest selling prices" on the Stock Exchange "upon the date of the gift." Each share of stock is to be valued separately and the size of the gift of any security is not a relevant factor and will not be considered in such determination of value. However, the rule attempted to be applied under this regulation was rejected by the courts, and the regulation was revoked and modified by a new regulation, first contained in T. D. 4901 (1 Cum. Bul. 1939, pp. 341, 342), as follows: "In cases in which it is established that the value per bond or share of any security determined on the basis of selling or bid and asked prices as herein provided does not reflect the fair market value thereof, then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value."

This change was carried forward and has been continued, unmodified, in sec. 86.-19, Regs. 108, supra, in which it is provided that "Where such method [values at the mean between the high and low selling prices on the Stock Exchange] does not reflect the fair market value of the gift, then some reasonable modification of such basis or other relevant facts and elements of value shall be considered in determining fair market value."

Sec. 506, Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 588, provides that "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Regs. 79, Art. 19(1), provides that "The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. All relevant facts and elements of value as of the time of the gift should be considered." And the regulations made pursuant to law from the inception of the gift tax have consistently provided, with the exception above-mentioned, as follows: "The value of stocks and bonds listed upon a stock exchange shall be obtained by taking the mean between the highest and lowest quoted selling prices upon the date of the gift, except where such selling prices do not reflect the fair market value of the gift."

The courts that have dealt with the matter of determining fair market value of a large block of stock for estate and gift tax purposes have held, and we agree with such holdings, that it is competent and material for a taxpayer to introduce evidence through witnesses who are familiar with and are in a position to know what conditions and circumstances have an effect upon the market value of stock or property to show, if it be a fact in the particular case, that as a result or because of such conditions and circumstances the fair market value or the realizable market value of a certain amount of stock or securities on the date of gift is less than the price at which a comparatively small amount of such stock or securities sold on the Stock Exchange on the date of the gift. The fact that a gift involves a large number of shares of stock or securities does not, standing alone, create any presumption as to value, but the size of the gift and the extent to which it may under proven conditions and circumstances affect the fair market value of the gift is a factor to be considered along with such other elements or factors affecting market value as may be shown by the evidence. Safe Deposit & Trust Co. of Baltimore v. Commissioner, 35 B.T.A. 259, 263, affirmed Helvering v. Safe Deposit & Trust Co., 4 Cir., 95 F. 2d 806.

Where a stock is listed on a Stock Exchange and is bought and sold from day to day at certain prices and in numbers of shares which are small, as compared to the number of shares of the same stock made the subject of a gift, a holding that competent evidence may not be submitted for the purpose of showing the fair realizable market value of a large block of such stock on a certain day may be less, as applied to each share, than such exchange prices would not accord with the provision of the statute that where a gift is made in property the value of the property at the date of the gift shall be considered the amount of the gift, nor with the regulation made pursuant to the statute which, with the exception hereinbefore mentioned, has been in effect since the gift tax was first imposed. As was said by the court in Groff v. Smith, D.C., 34 F.Supp. 319, 322, 323: "The Government objects that sales prices are the best evidence of market value. With this generality I agree. But I don't agree that the sales price of one acre of land or of 200 shares of stock is necessarily the best evidence of market value of a thousand acre tract or of a block of 14,000 shares. Hazeltine Corp. v. Commissioner, 3 Cir., 89 F.2d 513. The existence of a market for the smaller item is at most slight evidence of the contemporaneous existence of a larger market. One must consider the capacity of the market to absorb the large offering if there is competent evidence on that factor. A substantial disparity between the volume of sales upon which the Commissioner's finding is based and the size of the block to be valued, opens the door to competent evidence that the entire block could not have been sold at the sales prices obtaining at the critical date."

In the ascertainment of value "there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Standard Oil Company of New Jersey v. Southern Pacific Corporation et al., 268 U.S. 146, 156, 45 S.Ct. 465, 467, 69 L.Ed. 890.

The testimony and exhibits introduced by plaintiff give a complete background of the industrial and financial history and prospects of both Great Western and South Porto Rico. The testimony covered fully the subjects of capitalization, earnings, investment, book value of shares, and dividend policy. It presented all relevant stock market transactions for a year prior and a year subsequent to the basic date and interpreted these transactions. The testimony presented the good and bad points, from the standpoint of an investor, of sugar companies in general and these companies in particular, stressing tariff problems and political consideration, quotas which curtailed production and speculative factors inherent in the business. The state of the stock market near November 19, 1934, was examined and the progress of Great Western and South Porto Rico stocks contrasted with other sugar stocks and with other industrials. The ability of the stock market to absorb additional shares of these two stocks was investigated and set forth in the record, as well as the possibilities of outside financing. Flotations of comparable lots of securities were referred to, with details of prices to the owner and to the public and the reasons for the spread between the two. There was definite and convincing testimony on the subject of the highest price which a willing seller might expect to receive for these shares from a willing buyer on November 19, 1934.

Both Great Western and South Porto Rico were well organized and operated sugar companies with good production and fair earnings records. Their stocks sold in substantial quantities on the New York Stock Exchange but both price and volume had been declining for a year prior to November 19, 1934, although the general market trend was upward.

On that date Great Western common was selling around $28 a share, or approximately 31½ times its five-year average annual earnings of 89 cents. South Porto Rico was selling about $24.50 a share, or approximately thirteen times its five-year average annual earnings of $1.88. At that time informed opinion in financial circles considered the outlook for future earnings of these corporations to be unfavorable.

In 1934 the stock market machinery for handling sales of large blocks of stock was not as well developed as it is today. Any attempt to dispose of these blocks of Great Western and South Porto Rico would have depressed the market over the long term necessary to sell the shares. There was no particular demand for either of these stocks in excess of the amounts being currently traded in. The 160,000 shares of Great Western represent 6,400% of the 2,500 shares actually traded on November 19, 1934, 3,700% of the 7,100 shares sold during that week, and 816% of the 26,900 shares sold during November 1934. The 20,000 shares of South Porto Rico are 2,222% of the 900 shares actually sold on November 19, 1934, 465% of the sales of 4,300 shares for the week, and 102% of the sales of 19,600 shares for the month of November.

The evidence shows that the quantities involved were too large for the stock market to absorb on one day. The greatest returns to a seller on November 19, 1934, would have been from a sale to an underwriting syndicate for resale to the public. Without going into the details of the underwriting, which is covered in the findings, the proof shows that a seller of these shares of Great Western could reasonably have expected to receive not more than $25 a share, and for South Porto Rico not more than $22 a share.

The proof shows that on the universally accepted test of a willing buyer and a willing seller, the fair market value on November 19, 1934, of the Great Western stock was not in excess of $25 a share, and for South Porto Rico not in excess of $22 a share. The evidence shows that these values are based upon the theory of the greatest return to the seller. It cannot, therefore, be said that some other method, as to which there is no evidence, would have yielded a greater return.

In Helvering v. Safe Deposit & Trust Co. of Baltimore, supra, the court had before it for review a decision of the Tax Court fixing fair market values for estate-tax purposes for 35,000 shares of one stock and 134,000 shares of another. The values which had been determined by the lower court were below the Stock Exchange prices for November 30, 1931, the date of death, and the only question before the court was whether, as a matter of law, the Tax Court rightly took into consideration the proven effect of the amount or number of shares of stock to be valued. The court, 95 F.2d at page 812, said:

"In our opinion, the Board was right in basing its conclusions upon the realities as it found them rather than upon considerations of abstract logic. It could not ignore the pregnant fact, having found it to exist, that a large block of stock cannot be marketed and turned into money as readily as a few shares. The opposite condition might possibly have prevailed, for the influence of the ownership of a large number of shares upon corporate control might give them a value in excess of prevailing market quotations; in which event the application of the administrative rule would be unfair to the government. It would have been improper of course to have adopted as the true value of the stock the price obtainable by forcing or dumping the whole block on the market at one time; and likewise improper to have based the finding on the value as of an earlier or later date. But the Board did none of these things. It took into consideration the difficulty inherent in disposing of so large a quantity of stock, the market price for a few hundred shares on the day of death, and the downward trend of the market as indicated by sales before and after death, and it made an estimate of market value of the whole, as required by the statute. In so doing it was obliged to use its best judgment rather than a cut and dried formula; but this was only the employment of a familiar process which on numerous occasions has been defended by the Commissioner and approved by the courts."

Following the decision in the Safe Deposit & Trust Co. case, supra, by the Court of Appeals for the Fourth Circuit, the Cir-

cuit Court of Appeals for the Seventh Circuit decided the case of Commissioner v. Shattuck, 97 F.2d 790, 792, and held that Treasury Regs. 79, art. 19(3) (1936), which provided that in determining the value of a gift for the purpose of the excise tax the size of the gift of any security was not a relevant factor to be taken into consideration, was invalid. The court further said:

"To hold that the value of a large block of corporate stock, for which there is no market, must be determined at the same value per share as that for which a few shares were sold, for which there was a market, without taking into consideration other factors and circumstances which plainly affects the value is supported by neither logic nor reason. It is a matter of common knowledge that the value of any product or commodity, whether it be wheat, hogs, or otherwise, is affected by the law of supply and demand, and that where the former far exceeds the latter, it has a depressing effect upon value. Reference to the daily markets of the country support this statement. No doubt the value of corporate stock is similarly affected.

"We agree with the statement of the Board of Tax Appeals (decision unreported):

" 'This evidence further shows to our satisfaction that the 30,000 shares disposed of by each petitioner by gift could not possibly have been sold through the Stock Exchange, or otherwise, at the mean of the prices realized on the comparatively small quantity actually sold or the mean of the bid and asked prices on the date the gifts were made. Petitioners have presented the uncontradicted testimony of qualified witnesses familiar with the problem of disposing of stock of this character in blocks of this size, from which it is quite evident that such disposal could not have been effected except at so-called wholesale prices, by an arrangement for the underwriting of the disposal of the sale of stock which would have entailed an expense netting a price below that possible to have been secured for small blocks of stock through market sales at retail.' "

The case of Helvering v. Maytag, 8 Cir., 125 F.2d 55, involved the determination of the fair market value on January 18, 1934, for estate-tax purposes, of 133,859 shares of common stock and the fair market value on December 18, 1934, for gift-tax purposes of 400,000 shares of the same stock. The stock was listed and traded in con-

tinuously on the New York Stock Exchange, but not in numbers of shares comparable to the blocks to be valued. The Government contended before the Tax Court and the Circuit Court of Appeals that the exchange prices should govern and that the total number of shares involved should be valued for each share on the basis of the mean between the highest and lowest selling prices on the Stock Exchange. The Tax Court after considering all the evidence reached the decision that the fair market values of the stock on the applicable dates were substantially less than the Stock Exchange prices. The Circuit Court of Appeals affirmed, and said, 125 F.2d at page 63:

"On the other hand, while we are cited to no direct ruling of the Supreme Court or this court upon the precise contentions here presented for the Commissioner, they have been frequently considered by other federal courts and the decisions are unanimously against him. As well as any controverted question of administrative law may be settled without declaration by the Supreme Court, it is established that the size of a block of listed stock may be a factor to be considered in its valuation for gift or estate tax purposes. Where, as in this case, the taxpayer affirmatively shows that a block of listed stock to be valued is very great in comparison with the amounts of the stock which have been traded in on the exchange where it is listed, that the block of stock could not be sold on such market at its quoted prices within a reasonable time by skilled brokers following prudent practices for liquidation and that the true value of the block of stock is in fact different from the price quotations, then the taxpayer is entitled to have all other proper evidence of the value of the block of stock considered together with the market quotations. The arguments for the Commissioner to the contrary have not persuaded us that the rulings of other Circuit Courts of Appeals and District Courts to the stated effect should be departed from."

The Government's petition for writ of certiorari to review the above decision was denied. 316 U.S. 689, 62 S.Ct. 1280, 86 L. Ed. 1760.

In the recent case of Henry F. du Pont v. Commissioner of Internal Revenue, 2 T.C. 246, the court had before it the matter of determining the fair market value on January 4, 1939, for gift-tax purposes,

of 52,900 shares of the du Pont Company's common stock; on the date in question 1,400 shares were sold on the New York Stock Exchange at from $152 to $154.25. The Treasury had valued the 52,900 shares at the mean between these two prices, or at $153.125. During the month of January 1939, 41,400 shares of the du Pont stock had been sold on the market at from $156.75 to $142. Trading in this stock was at all times active and substantial. After considering all the evidence submitted, the Tax Court determined the value of the 52,900 shares at $135 a share. The court said:

"We have fixed the value of the corpus of the trust fund at a price per share of $135. This is some 18 points below the per share price at which the stock was selling on the New York Stock Exchange on the date of the gift. In the light of the evidence, however, we are satisfied that the actual sales figures are not to be taken as an accurate reflection of value by reason of the size of the block involved in the gift which consisted of upwards of 50,000 shares of the same stock. * * *

"There was uncontradicted testimony from petitioner's witnesses that in their opinion the sale of a block of that size on or about the date in question at stock market prices would have been impossible. If such a view was excessively pessimistic, the respondent had ample opportunity to produce contrary evidence, but this was not done. He contended strenuously at the hearing, and continued to do so in his brief, that petitioner's testimony was inadmissible and should be disregarded. But the respondent's regulations on the subject take notice of the present situation and permit 'some reasonable modification' where 'it is established that the value per bond or share of any security determined on the basis of a selling or bid and asked prices as herein provided does not reflect the fair market value thereof.' Regulations 79, art. 19(3), as amended by T.D. 4901. It would be in the highest degree anomalous, and this portion of the regulation would be deprived of all meaning, if a taxpayer were prevented from establishing by testimony the very fact which the regulation requires as the premise for the 'reasonable modification' of market prices which the same provision permits. There may be better ways to submit such proof, although they are not readily apparent, but we cannot for that reason refuse to consider the opinions of qualified witnesses in the absence of better evidence and in fact of any at all."

Upon the facts established by the evidence submitted in the case at bar, we are of opinion that the fair market values of the 160,000 shares of Great Western and 20,000 shares of South Porto Rico stocks were $25 and $22 a share, respectively. It therefore follows that plaintiff overpaid the gift tax on gifts made during the calendar year 1934.

It appears, however, from the facts (findings 5 to 8, inclusive) that the claim for refund filed by plaintiff in 1939 was filed more than three years after payment of the tax on the gifts made in 1934, except as to the portion of such tax paid on July 13, 1937, of $23,433.53 plus interest of $3,252.12, totaling $26,685.65 (finding 3).

Plaintiff contends, however, that under the provisions of secs. 501(a) and 502 of the Revenue Act of 1932, which provided for a computation of the gift tax at the graduated rates on all gifts made after the enactment of that act, Congress departed from the annual method of imposing the tax and based the computation of the gift tax to be paid not only upon gifts made within a single year, but also upon gifts made in all preceding years, subsequent to 1931, and that, by reason of this method of imposing and computing the gift tax, a taxpayer is entitled under a claim for refund filed within three years after payment of the gift tax for any year to recoup out of such payment, any overpayment which may have been made in a prior year, even though the tax for such year of recoupment is not overpaid.

We think this contention is without merit under the clear provisions of the statute. It seems clear enough from the provisions above referred to with reference to the method and manner of computing the gift tax on gifts made in the calendar year 1932 and subsequent years, as explained in the Reports of the Congressional Committee (House Report 708, 72d Cong., 1st sess., pp. 462, 477), and Treasury Regs. 79, art. 5, 1932 Ed., when considered in connection with the provisions of sec. 528 of the Revenue Act of 1932 relating to refunds and credits of gift taxes, that Congress intended any refund of a gift tax paid upon a gift made in a certain year should be barred unless a claim for refund thereof is filed within three years from the time such tax was paid. Sec. 528 provides that where there has been an overpayment

of a gift tax the amount thereof shall be credited against any gift tax then due from the taxpayer and any balance shall be refunded, and under subsections (b), (1) and (2), entitled "Limitation on Allowance," it further provides as follows:

"(1) *Period of limitation.* No such credit or refund shall be allowed or made after three years from the time the tax was paid, unless before the expiration of such period a claim therefor is filed by the taxpayer.

"(2) *Limit on amount of credit or refund.* The amount of the credit or refund shall not exceed the portion of the tax paid during the three years immediately preceding the filing of the claim, or if no claim was filed, then during the three years immediately preceding the allowance of the credit or refund. * * *"

The report of the Ways and Means Committee on the Revenue Act of 1932, as well as the report of the Finance Committee of the Senate (Senate Report No. 665, 72d Cong., 1st sess., p. 525), after setting forth that the theory upon which the gift tax was based in that act was that the rate of tax should be measured by all gifts made after the enactment of that act, and that this scheme was adopted in order to tax gifts made over a period of years at the same rate as if they had all been made within one year, stated that "For a more effective administration and to secure prompt collection of the revenues, the bill provides that the tax shall be computed and collected annually."

■ In view of the above, it follows that such portion of the overpayment of tax on the gifts made in 1934 as was included in the tax paid on March 14, 1935, when the gift-tax return for 1934 was made, is barred by the statute of limitation imposed by sec. 528, supra, and plaintiff's recovery in respect of such overpayment must be limited to the amount of $26,685.65 with interest, as provided by law. Judgment for that amount will therefore be entered. It is so ordered.

WHALEY, Chief Justice, and WHITAKER, Judge, concur.

MADDEN, Judge (dissenting).

I think the evidence introduced by the plaintiff, upon the basis of which the court has decided the case, has no tendency to prove that the stock exchange prices on the day of the gift were not the actual values of the stock given. The Revenue Act of 1932 provided:

"Sec. 506. If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

Treasury Regulations 79 (1933 Ed.) gave, in Article 19, the conventional definition of value. It said "The value of property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell." This meaning of value is used for all sorts of legal purposes, such as direct property taxes, excise taxes computed on value, condemnation and requisition for public use, measuring damages for destruction or conversion and other purposes. When the local tax assessor values the livestock in his taxing district, he uses this definition of value, but he does not assess A's 100 cows at $90 a head, and B's 1 cow at $100 a head because, although cows of the kind they both have are selling currently at $100 a head, the available market would be depressed if A's 100 cows were all offered for sale on the assessment day. He knows that A is not selling his cows, and is not willing to sell them for even $100 a head, to say nothing of $90. They are not being sold, en bloc; they are being taxed. And if A should, on the tax day, make a gift to his son of his 100 cows, it would be remarkable if the gift tax gatherer, in applying the same meaning of value to the same cows, should be obliged to value them at $90 a head.

The fallacy in the plaintiff's contention is well stated by Judge Murdock of the Tax Court in his dissenting opinion which was concurred in by five other judges, in Avery v. Commissioner, 3 T.C. 963, 971. He says that the evidence of the taxpayer in that case, which was like that of the plaintiff in this case, did not tend to show what a willing seller would have sold the stock for, but what an unwilling seller, forced to market an unusually large block of the stock on a single day, would have had to take for it. Neither in that case nor this is there any evidence whatever as to what a willing buyer, desirous of acquiring so large a block of stock on a certain day, would have had to pay for it. Certainly he could not have bought it from the plaintiff at a discount for quantity. We know that if a willing buyer had placed an order for such a block of stock on a certain day, the price would have gone up.

When, as here, we are not dealing with actual sales, but are attempting to determine hypothetically a market value, I can think of no reason why what a hypothetical seller of an extraordinary amount of a commodity on the tax day would have to take for it is a bit more relevant than what a buyer of an extraordinary amount of the same commodity on the tax day would have to pay for it. In short, I think that neither figure is of any assistance. If the commodity were one for which there is a normal wholesale market, so that one who desired a large amount of it could on that market buy it cheaper, in the regular course of business, and one who had a large amount of it to sell could, because of the competition of other wholesalers, expect to get only the wholesale price, then evidence of that price would be evidence of value. But there was no wholesale market for the stock here in question, and no owner of it would, willingly, throw so much of it in one day upon a market in which only smaller amounts were being traded.

The plaintiff's evidence is based on the hypothetical assumption that the whole 160,000 shares of Great Western stock and the whole 20,000 shares of the South Porto Rico stock were to be marketed on the same day. But the gifts were to four individuals, and the majority of the Tax Court in the Avery case, supra, held that the hypothetical sale of the stock given to each donee should be treated separately, and in disregard of the others. The result was that the hypothetical market was not so seriously affected, and the prices were not discounted so much from the actual market prices, as they would have been under the other assumption. I see no particular reason for so splitting up the total of the gifts, if we are to engage in the assumption that sales were made which were not made, and in a kind of market which did not exist. I should think that if other donors happened on the same day to make large gifts of the same stock, it would be reasonable to urge that those gifts be included in the hypothetical offerings to the market. But I think it would be equally reasonable for the tax assessor, in determining the value of the livestock in his county on the statutory assessment day, to assume that all the livestock in the state were hypothetically for sale on that day, which, if he did assume it, would depress assessed values, though it would have noth-

ing whatever to do with the actual market value of livestock.

I think the stock exchange prices which the plaintiff used in his original return, and which the Commissioner accepted, are the only relevant evidence of value which we have. I would, therefore, dismiss the petition.

JONES, Judge, took no part in the decision of this case.