**CAMPBELL'S ESTATE et al. v. KAVA-NAGH, Collector of Internal Revenue.**

No. 12221.

United States District Court
E. D. Michigan, S. D.

Sept. 15, 1953.

George L. Cassidy, William Loud, Detroit, Mich., for plaintiffs.

Fred W. Kaess, U. S. Dist. Atty., Detroit, Mich., Lester L. Gibson, Asst. Atty. Gen., for defendant.

PICARD, District Judge.

This is an action brought by plaintiffs, executors of the Estate of Wilfred W. Campbell, deceased, to recover monies collected by defendant, Collector of Internal Revenue, as an alleged deficiency in estate taxes.

Decedent died at Detroit, Michigan, December 6, 1947. In the estate's return, plaintiffs included 400 common stock shares, Boyer-Campbell Company, owned by decedent, at a value of $149 per share and excluded therefrom the value of 880 shares of said stock which decedent had given his wife, son, and daughter, December 27, 1935.

The Commissioner of Internal Revenue determined a deficiency in estate taxes on two grounds: (1) That the block of 400 shares should have been valued at $175 per share, and (2) that the gift of 880 shares should have been included in the gross estate as a gift made in contemplation of death.

### As To the 400 Shares

On the question of proper valuation of the block of 400 shares for estate tax purposes, the parties have stipulated to the following facts:

1. "The stock of Boyer-Campbell Company is not listed on any stock exchange and is not traded-in on an over-the-counter basis. At the time of decedent's death there were 3,090 shares of said stock issued and outstanding, and his immediate family owned approximately 40% thereof, the remainder being largely owned by his two business associates, neither of whom had controlling interest."

2. "If four hundred or more of said shares had been the subject of a public offering on December 6, 1947, they could have been so marketed successfully at $175.00 per share."

3. "The sale of said shares through brokers at a public offering would have given rise to underwriting and distribution costs of about $26.00 per share."

4. "Costs of underwriting and distribution are recognized as ordinary and usual expenses to sellers in instances of exchange or sale of stock through brokers."

The issue is whether the amount it would have cost to sell said stock is deductible in determining its fair market value at the time of decedent's death.

Treasury Regulation 105, § 81.10, provides in this connection that:

"The value of every item of property includible to the gross estate is the fair market value thereof at the time of the decedent's death; or, if the executor elects in accordance with the provisions of section 81.11, it is the fair market value thereof at the date therein prescribed or such value adjusted as therein set forth. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. *All relevant facts and elements of value as of the applicable valuation date should be considered in every case.*" (Emphasis ours.)

It appears that the courts are not in harmony on this question, chiefly because each case seemingly presents different equities. In Groff v. Munford, 2 Cir., 150 F. 2d 825, the court took the mean market price of the stock exchange and deducted the $2 broker's fee. But we have no stock exchange price here.

In Re Estate of Bodell, 47 B.T.A. 62, 67, plaintiffs' contention is upheld to the extent that the value of the stock is what "decedent's estate would have been able to realize from the sale * * *. But here again under practically the same state of facts the broker's fee was set at one or two dollars.

In Estate of Munroe v. Commissioner, decided March 6, 1946 (1946 P–H T.C. Memorandum Decisions, par. 46,050 at p. 113) the court took just the opposite view and stated:

"The expense, tax, and gain (or loss) upon a *possible* exchange or sale of stock have never been regarded as proper reductions in valuing the shares."

We place emphasis on the word "possible."

See also Estate of Lunken v. Commissioner, decided June 11, 1945, (1945 P–H T.C. Memorandum Decisions, par. 45,203); Havemeyer v. United States, 59 F.Supp. 537, 103 Ct.Cl. 564.

We cannot follow any of these alleged authorities in toto if, as we are instructed by the Regulations, we must consider "all relevant facts and elements of value as of the applicable valuation date * * *". Among these are:

(a) Boyer-Campbell Company was a closed corporation. No outsiders would have been able to buy any of its stock. In

1945, the corporation was offered a very high price to sell out but refused and only a few select employees ever could get in. Stockholders not on salary usually want dividends;

(b) The stock was never offered for sale and, of course, never sold;

(c) The $175 value placed on the stock by stipulation was too low but in the absence of more definite information this price probably should be accepted by the court;

(d) The cost of selling that particular stock as agreed upon in the stipulation ($26 per share) is ridiculous. It would seem that both the government and the petitioners had in mind the floating of some bond or stock issue of uncertain quality and involving many other difficulties. None of the cases cited place any such "cost" upon the sale of this type of stock. Undoubtedly part of the stock or all could have been sold to some employee if the employee was a "willing buyer" and the estate was a "willing seller;" without any cost;

(e) The regulation provides that the "value is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date * * *." It does not specify that costs of sale should be deducted, particularly when, as in this case, the estate never intended to offer it for sale under any circumstances;

(f) No great elucidation was given this court as to the basis for either the $175 market price or the $26 selling costs; and

(g) The book value, earning power, and management.

Taking into consideration all the relevant facts, we conclude that we will accept the stipulated market price of $175 per share, without permitting any deduction for "selling costs" for the reasons above stated, particularly the fact that the stock was not sold and, in the opinion of this court, it was never intended that it should ever be put up for sale.

### As to the 880 Shares

Were the 880 shares of stock given by decedent to his wife, son, and daughter on December 27, 1935, properly excluded from his gross estate by plaintiffs, or should said stock have been included on the ground that the gifts were made "in contemplation of death" within the meaning of the Internal Revenue Code, Section 811(c)(1)(A), 26 U.S.C.A.?

U. S. Treasury Regulation 105, Sec. 81.-16, provides:

"Transfers in contemplation of death made by the decedent after September 8, 1916, other than bona fide sales for an adequate and full consideration in money or money's worth, must be included in the gross estate. A transfer in contemplation of death is subject to the tax although the decedent parted absolutely and immediately with his title to, and possession and enjoyment of, the property.

"The phrase 'contemplation of death,' as used in the statute, does not mean, on the one hand, that general expectation of death such as all persons entertain, nor, on the other, is its meaning restricted to an apprehension that death is imminent or near. A transfer in contemplation of death is a disposition of property prompted by the thought of death (though it need not be solely so prompted). A transfer is prompted by the thought of death if it is made with the purpose of avoiding the tax, or as a substitute for testamentary disposition of the property, or for any other motive associated with death. The bodily and mental condition of decedent with all other attendant facts and circumstances are to be scrutinized to determine whether or not such thought prompted the disposition."

■ The burden of proof, that the gift was not made in contemplation of death, is on plaintiffs even though the transfer took place more than two years before decedent's death, in as much as the Commissioner's finding is presumed to be correct. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Wishard v. U. S., 7 Cir., 143 F.2d 704.

And what makes plaintiffs' task more difficult is that when the return reporting

decedent's gifts was filed with the Internal Revenue Department, in the blank space marked "Motive" were written the words "* * * to avoid future inheritance taxes." Defendant insists that decedent therein plainly denoted his intentions of trying to exempt his estate from paying taxes after his death by a substitute for testamentary disposition. That it not only was his dominant "motive" but in truth the only one he had. A potent argument, not entirely offset by the fact that the donor lived almost 12 years after his gift was made.

■ But, fortunately for plaintiffs position, even if one does express his motive in writing, the issue is not closed. His statement is not final either for or against him. The Commissioner and the courts may make inquiry "whether or not such thought prompted the disposition" in order to ascertain what, in fact, was decedent's *dominant* motive in making the gifts. U. S. v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867; Bell v. U. S., D.C., 74 F. Supp. 295; Loetscher v. Burnet, 60 App. D.C. 38, 46 F.2d 835; Estate of Bertha M. Engel, decided Jan. 29, 1947, CCH 6 T.C. Mem. p. 10, Docket 8347.

■ Examining the record we find it is undisputed that decedent enjoyed excellent health and led an active life prior to the time he made the gifts, December 27, 1935. He was then 57 years old, and lived for almost 12 years thereafter. During those years, he continued to go on numerous fishing trips, golfed regularly, and traveled extensively. In 1940, he hired an architect to draw plans for a year-round home on Cass Lake, but due to the outbreak of the war and his son's entrance into the Navy, it was never constructed. Decedent had a very happy home life and was devoted to his wife and two children. He was generous by nature and made numerous additional gifts to his family and relatives after 1935 that are not questioned by defendant. In general, he was a man of good spirits, not inclined to be moody or morbid. The Boyer-Campbell Company occupied a place in his life second only to that of his family. He was one of its founders and was actively engaged in and intimately associated with it from 1906–1946. It was one of decedent's fondest ambitions to have his son participate in the business with him, to which end in 1945, he rejected the cash offer for the business as above mentioned. Testimony indicates that one of the motives behind the 1935 gift to his son was to induce him to take an interest in the company by giving him a stake in it when he left college. It was not until May 17, 1944, eight and one-half years after the date of the gifts in question, that decedent executed his will.

It is also well to note that decedent's financial condition in 1935, indicates that had he died intestate that year, the inheritance taxes on his estate would have been negligible.

The government does not seriously contest the foregoing facts, but in supporting its claim clings tenaciously to the damaging sworn statement: "Motive: In both instances to avoid future inheritance taxes."

So taking into consideration all these relevant factors and weighing them against the statement in the return, we are forced to the conclusion that this man's gifts became the unintended target of a public accountant's enthusiasm with misapprehension of the law. That is all.

We find, therefore, that the dominant motive of decedent in making the 1935 gifts was not "in contemplation of death." On the contrary, we believe and determine that the evidence in the case clearly establishes that while the statement in the return may have been in part prompted by "that general expectation of death such as all persons entertain" nevertheless the gifts in question were made with dominant motives associated with "life" and not "death." See Bell v. United States, supra.

Certainly as stated in Allen v. Trust Co. of Georgia, 326 U.S. 630, 635, 66 S.Ct. 389, 392, 90 L.Ed. 367,

"* * * every man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts plainly are not made in contemplation of death in the statutory sense."

But here, if there is any dominant motive at all, it was decedent's desire to see that his family, especially his son, would have an interest in the business so that in his declining years or even after his death, the name "Campbell" would continue as part of that concern.

Finally—and this might be of equal importance—it will be noted also that the word used in donor's return referred to "inheritance" taxes—not "estate" taxes. If defendant desires to hew to the line by a narrow interpretation that has no basis in equity, should it not be held to strictness in all things? "Inheritance" taxes are collected by the state—not by the federal government. Viewed in this light, the reason for the gift as given in the return is not quite so damaging as it might otherwise appear.

On the second issue we hold for plaintiffs and a judgment in conformity with this opinion may be presented for our signature.