## McNeil Tax Assessment Case.

554

Argued May 27, 1969.   Before BELL, C. J., COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*Anthony J. Giangiulio,* Solicitor, for board, with him *Roger B. Reynolds,* Solicitor, for county, appellants.

*Levy Anderson,* First Deputy City Solicitor, with him *Nicholas M. D'Alessandro,* Assistant City Solici-

tor, and *Edward G. Bauer, Jr.,* City Solicitor, for intervenor.

OPINION BY MR. JUSTICE O'BRIEN, October 9, 1969:

Robert J. McNeil and Henry S. McNeil, on December 31, 1964, owned respectively 145,910 shares and 189,799 shares of the common stock of Johnson & Johnson, Inc. Pursuant to the provisions of the Montgomery County personal property tax, they filed returns, listing their shares of Johnson & Johnson. Each valued his shares at 70% of the closing price of the stock on December 31, 1964. The Board of Assessment and Revision of Taxes of Montgomery County rejected these valuations and assessed the stock at its full value as reflected by the December 31, 1964, closing price. The stock closed on the exchange on December 31, 1964, at $111.75 per share.

The McNeils appealed the valuation of the Board to the Court of Common Pleas of Montgomery County, which evaluated the shares at 90% of their December 31st close. The Board appealed to the Superior Court. That Court, in an opinion by Judge HOFFMAN, remanded the matter to the Court of Common Pleas for further proceedings. Judge JACOBS noted that he would affirm on the opinion of the Court of Common Pleas and Judge MONTGOMERY filed a dissenting opinion in which Judge HANNUM joined. Both the McNeils and the County filed petitions for allocatur which we granted, limited to the question of the applicability of "blockage" in personal property tax evaluation. Subsequently, the City of Philadelphia sought and was granted leave to intervene. The City briefed and argued the case in support of the position of the County.

The critical question which the courts below had to determine was whether the theory of "blockage" is applicable to the valuation of large blocks of stock in personal property tax evaluations. The Act of June

17, 1913, P. L. 507, 72 P.S. 4821, provides for County personal property taxes at the rate of 4 mills and §4.1 of the Act, 72 P.S. 4843.1, requires annual evaluation of all taxable property. In this case the valuation date, fixed annually for the valuation of stock, is December 31st.

Judge HOFFMAN reached the conclusion that the situation is analogous to that which exists in estate, gift and inheritance tax laws. He concluded that the large shareholdings of the taxpayers would cause a depression in the market for those stocks, should they desire to dispose of their holdings. He therefore reasoned that their actual value is less than the value reflected by the trading of a limited number of shares of that stock on the exchange on the valuation date. He remanded the matter because he was dissatisfied with the method used by the Court of Common Pleas in determining the 90% valuation. First of all, he found that the expert witnesses considered an average of the McNeil brothers' shares in order to reach their conclusion that the stock price would be depressed by 6% if a secondary distribution, the most practical and economical method of liquidating these blocks of stock, were undertaken. He directed the Court of Common Pleas to take additional testimony in which any such depression should be considered individually for the two taxpayers by the expert witnesses. Secondly, Judge HOFFMAN concluded that the 4% which the Court of Common Pleas allowed as the profit for the underwriters of a secondary distribution was not a proper item for consideration in reducing the stock valuation on a theory of blockage. For those reasons, among others, the majority of the Superior Court held that although the blockage theory applies in personal property tax cases, the method used in determining the blockage factor on the evaluation of these large stockholdings was improper.

Judge MONTGOMERY, in his dissenting opinion, argued that blockage should not apply. He pointed out in his dissent: "From the joint research of the attorneys and the court, no precedent can be found for the application of the blockage rule in evaluating securities for personal property tax purposes. To me the reason is obvious. To do so would mean that factors not present, and therefore, irrelevant, must be considered in making the evaluation. Those factors determine the effect the projected sale of the securities held by any *one* taxpayer might have on their value. Such effect might be depressionary or inflationary, depending on still other factors, viz., the manner of making the sale, the need of the holder to sell, the general condition of the security market at the particular moment of sale, the state of the general economy which in turn would be determined by still other factors, etc., ad infinitum." (Emphasis in original). It is clear that if blockage is applied in personal property tax evaluations, imponderables too numerous to contemplate would be introduced into the process. In addition to the factors enumerated by Judge MONTGOMERY, one could add the most recent actions of the Federal Reserve Board, the prime interest rate, the actions of any number of committees of Congress, the state of the Paris peace negotiations and the actions of over a hundred foreign governments, to mention only a few. If for no other reason, the practical problem of evaluation which would be created precludes the application of the principle.

Moreover, we are not convinced that the analogy to the death tax situations is valid. In death tax evaluations, there may be good reason requiring the sale of the asset to be evaluated. Liquidation might be required for the payment of debts or taxes, or even because legatees did not choose to take in kind. In any event, in all such situations, there is an actual transfer of ownership. In personal property tax cases, the

property is being held as an investment, is not being transferred, and the spectre of required sale does not loom over the evaluation. In considering whether blockage should apply to large blocks of stock for purposes of the Florida Intangible Personal Property Taxation Law, the Florida Supreme Court held, *Florida National Bank v. Simpson*, 59 So. 2d 751 (1952), "The Chancellor found from the evidence that there was no necessity for placing large blocks of shares of stock on the market nor was there even a probability that it would or might be done and consequently, there was no occasion for invocation of the 'Blockage Rule.' The majority concurs in this view and is further of the opinion that the burden of showing the necessity or probability of a sale, or some facts which would make this rule or doctrine applicable was on the plaintiffs and that they not only failed to meet this burden but their positive testimony shows that there was no necessity or probability that the stock would be sold." We find no basis for the application of the blockage rule.

Furthermore, in addition to our previously expressed view that efficiency of operation requires evaluation based solely on the closing market price per share, we are convinced that common usage dictates that result. We believe that the Legislature intended the words "actual value" as used in the personal property tax act to mean the closing market price when dealing with shares of stock listed on the stock exchange. That is the method by which laymen and stock brokers alike determine the actual value of listed stocks, irrespective of the number of shares held or traded. Mutual funds and common trust funds determine the actual value of their holdings by simple reference to the market quotation, regardless of the size of the block held. These accepted facts were surely within the contemplation of the General Assembly when the

words "actual value" were used and we will give those words their usual, customary and plain meaning for the evaluation of listed stocks for personal property tax purposes.

Since we hold, for the reasons stated, that blockage is inapplicable in the evaluations under consideration, we need not, nor do we, reach the very interesting question of whether the allowance of blockage in such situations does violence to the uniformity requirement of the Pennsylvania Constitution.

The judgments of the Superior Court and of the Court of Common Pleas of Montgomery County are reversed and the cases are remanded to the Court of Common Pleas of Montgomery County with instructions to reinstate the evaluations fixed by the Board of Assessment and Revision of Taxes of Montgomery County.

Mr. Justice JONES took no part in the consideration or decision of this case.

DISSENTING OPINION BY MR. JUSTICE EAGEN:

I do not agree with the conclusion reached by the Majority. The question is not so much the applicability of the "blockage factor" in calculating the "aggregate actual value" of the stock owned by the appellees as the weight to be given to the closing stock market price of a listed stock in determining value. Should the closing stock market price be used as the sole criterion in fixing value?

The norm of valuation set forth in the Act of June 17, 1913, P. L. 507, §4.1, 72 P.S. §4843.1 is "the aggregate actual value of each part of the different classes of property made taxable by this act . . . ."

*Deitch Company v. Bd. of Property Assessment,* 417 Pa. 213, 209 A. 2d 397 (1965), is helpful in supplying a definition of "actual value." In that real estate assessment case, the court said: "The term actual value

means the market value and market value has been defined as a price which a purchaser, willing but not obliged to buy, would pay an owner willing, but not obliged to sell . . . ." Id. at 217, 209 A. 2d at 400.

As to the stress to be placed on stock market prices in determining value, *Clabby's Estate*, 308 Pa. 287, 162 A. 207 (1932) (a state inheritance tax case), addressed itself to this very question. There, the court said that "while market quotations on the day of death are evidence of value of stock, they are not conclusive of the actual value of the stock at that time. In fixing value, other evidence having a tendency either to decrease or increase the value as of the day of death is competent and should be considered." Id. at 292, 162 A. at 208. The court, though it did not find the "blockage factor" applicable under the facts of the case, did give sanction to its use as an aid in determining the value of large blocks of stock for State inheritance tax purposes.

The theory of "blockage" is explained in Lowndes & Kramer, *Federal Estate and Gift Tax* (2nd ed. §18.26, 1962), as follows: "Taxpayers have frequently contended where a large block of stock was to be valued that actual sales at or around the valuation date did not fairly reflect the fair market value of the stock, because they failed to discount the depressing effect which the sale of such a large number of shares would have on the market. This is called blockage. In a blockage situation, the unit of value is still the fair market price of a single share of stock; blockage requires that the price per share be lowered to reflect the effect of marketing such a large number of shares. "

"The argument in favor of it may be substantially reduced to the contention that the law of supply and demand necessarily affects the value of any commodity and that stocks are no exception to this well-established economic rule. It would be inaccurate to intimate,

however, that the rule impugns either the usefulness or the authenticity of market quotations. It is more fitting to state that it does project the question whether such quotations constitute demonstrable proof of the true taxable value of such large blocks of stock." Annot., 23 A.L.R. 2d 775, 776 (1952).

I agree with the majority opinion that the term "aggregate actual value" should be given its usual, customary and plain meaning, yet I am unable to make the leap of faith necessary to conclude that this *invariably* means "the closing market price, when dealing with shares of stock listed on the stock exchange." Market quotations are, at best, evidence of actual value. They are not, nor have they ever been held to be, the legal equivalent of actual value. The legislature could easily have provided for such a "short-step" evaluation in order to facilitate computation of the tax but it did not elect to do so. Instead, it levied the tax on the true value, the aggregate *actual* value of the stock. In my view, a proper evaluation of two such large blocks of stock as are involved in this case must consider the "blockage factor."

The majority opinion points to the numerous factors which would have to be considered if evaluations based on the "blockage factor" were employed. This multitude of factors can be reduced to just one: the need for expert testimony in determining value. Of course, expert testimony is and should be admissible to prove the value of property not otherwise susceptible to a fixed and precise evaluation. *Jarvis v. Bell,* 296 Pa. 568, 146 A. 153 (1929). "It was therefore competent to show what in the opinion of the experts the value of the stock thus sold [by dumping a large block of stock on the market at one time] would be under actual conditions in business. Such evidence is substantial when grounded on actual experience, and cannot be classed as defective unless all expert evidence

is to be so considered." *Clabby's Estate,* supra, at 293, 162 A. at 208. Here, where the closing market price is not an accurate reflection of the actual value of two such large blocks of stock, then expert testimony should be consulted to assess those factors which determine their value.

I must also disagree with the Majority when it seeks to differentiate State personal property tax evaluations from State inheritance tax evaluations and Federal estate and gift tax evaluations. In the death and gift tax areas the courts have recognized the "blockage factor" to such an extent [*Helvering v. Estate of Maytag,* 125 F. 2d 55 (8th Cir. 1942), cert. denied, 316 U.S. 689, 62 S. Ct. 1280 (1942); *Helvering v. Safe Deposit & Trust Co. of Baltimore,* 95 F. 2d 806 (4th Cir. 1938); *Jenkins v. Smith,* 21 F. Supp. 251 (D. Conn. 1937)] that it has received the implied sanction of the Internal Revenue Service as a proper means of computing the value of large blocks of stock. Treas. Reg. §20.2031-2(e) (1958).

The "spectre of required sale" is noticeably absent in several Federal estate tax cases which have allowed the "blockage factor" to be considered. *Helvering v. Estate of Maytag,* supra; *Jenkins v. Smith,* supra. In *Maytag,* the argument that no forced sale was carried out or even anticipated was expressly raised by the Internal Revenue Commissioner and rejected by the court which allowed blockage considerations nonetheless.

Moreover, the "blockage factor" has been recognized in the Federal *gift* tax area where forced sale considerations are not even present. *Helvering v. Estate of Maytag,* supra; *Havemeyer v. United States,* 103 Ct. Cl. 564, 59 F. Supp. 537 (1945), cert. denied, 326 U.S. 759, 66 S. Ct. 138, 139 (1945).

In these areas no more than in the personal property tax area, it is a hypothetical value that is to be

determined. The criterion is not whether there is any **real** necessity to sell the block of stock, or whether in fact the block has been sold, but rather, what would be the actual value, the market value, if it were sold. (The closing stock market price is just as much a hypothetical determination of value as is the blockage factor evaluation.)

I do not feel that allowing the blockage factor to be considered in State personal property tax evaluations offends the uniformity requirement of Article VIII, Section 1 of our Constitution. Of course, absolute uniformity in taxation is not required. It is sufficient if substantial uniformity is achieved. *Sablosky v. Messner,* 372 Pa. 47, 92 A. 2d 411 (1952).

It would appear that when the "aggregate actual value" of a large block of stock of one owner is determined and the "aggregate actual value" of a few shares of another owner is also determined upon a consideration of those factors which tend to establish value, including the amount which each might realize upon a sale thereof, then there is no substantial inequality as between the two taxpayers and there has been full compliance with Article VIII, Section 1 of our Constitution.

As was said by Mr. Justice (now Chief Justice) BELL: "A difference in the methods or yardsticks or formulas used in ascertaining and determining actual or market value does not prove lack of uniformity if there is a reasonable, practical and just basis for the application of different methods or formulas." *Hammermill Paper Co. v. Erie,* 372 Pa. 85, 98, 92 A. 2d 422, 429 (1952), cert. denied, 345 U.S. 940, 73 S. Ct. 831 (1953). That basis is clear. The "blockage factor" has been shown to be an important consideration in evaluating a large block of stock. As such, it should be employed in determining actual value. Merely because it has no relevance whatsoever in valuing a small

number of shares and would never be so employed is no reason to conclude that there is a resulting lack of substantial uniformity of taxation. In both cases, it is "aggregate actual value" that is being determined by a consideration of those factors relevant in establishing value. On this point, the language of the court in *North Side Laundry Company v. Board of Assessment, Appeals and Review,* 168 Pa. Superior Ct. 495, 498-99, 79 A. 2d 215, 217 (1951) is quite pertinent and warrants being quoted at length: "We are in accord with this statement of appellee's counsel . . .: 'The basic and fundamental fallacy in appellant's contention is in its *assumption* that the application by the Board of a rate of 30 cents per square foot to appellant's property is the application of a different *standard* to its property from that applied to residential property. This assumption is patently erroneous for what the Board did was not to value appellant's land on the basis of any supposed classification or different standard, but to apply, in strict accordance with the statute and the decisions of this Court and the Supreme Court *one standard, viz., actual value,* to appellant's land and find that it was *worth* 30 cents per square foot, while applying the *identical standard,* viz, *actual value,* to surrounding residential plots and find [if assessments by the foot front rule be translated into values based on area] that they were *worth* 17 to 25 cents per square foot.' In short appellant in reality is asserting merely a difference in the method used in ascertaining value, and not lack of uniformity in standards of value in the assessment of lands of different character as to size and use. But regardless of the difference in method there was no difference in the *standard* of assessment of appellant's commercial property as compared with that of residence properties in the neighborhood. The difference is merely in

the *indices* accepted as indicating actual or market value for assessment purposes."

Finally, I agree with the conclusion of the majority of the Superior Court that the testimony presented in the trial court was insufficient to sustain the order entered, and hence agree that the case should be remanded for further proceedings.

Mr. Justice POMEROY joins in this dissenting opinion.

---

DISSENTING OPINION BY MR. JUSTICE POMEROY:

I join in the opinion of Justice EAGEN and respectfully dissent from the decision of the majority which refuses to give effect to the so-called "blockage" factor involved in the valuation of large aggregates of stock for the purposes of the County Personal Property Tax Act (hereinafter "the Act"). Act of June 17, 1913, P. L. 507, as amended, 72 P.S. §4821 et seq. While I would affirm the order of the Superior Court on the basis of Judge HOFFMAN's opinion, I deem it appropriate, in light of the Court's opinion, to make certain observations which supplement those of Justice EAGEN and of the Superior Court.

At issue in this appeal is the meaning of the term "actual value" of taxable property as used in Section 4.1 of the Act,[1] for the tax made payable under the Act is calculated on the basis of that value. The taxable "value" of any property is measured in terms of the recognized medium of exchange, i.e., legal tender. This value is commonly established by the conceptual device of a hypothetical exchange of the property in question for legal tender on the relevant valuation date. The idealized transaction thus postulated establishes the "price which a purchaser, willing but not obliged to buy, would pay an owner willing, but not

---

[1] 72 P.S. §4843.1.

obliged to sell." *Deitch Co. v. Board of Property Assessment,* 417 Pa. 213, 217, 209 A. 2d 397 (1965).

When the value of a security listed on a recognized stock exchange is at issue, the terms of this hypothetical transaction are generally supplied by the stock market itself. Ordinarily, the best evidence of the price a willing buyer would pay and a willing seller would accept is the closing price of that security on the relevant valuation date. This closing price is the result of actual transactions between buyers and sellers who are presumed to be under no compulsion. That price is a function, however, of the supply-and-demand factors operating in the market on the date in question, and any significant change in the supply of, or demand for, a security will be reflected in its price. Thus, if the sale of a large bloc of a security should occur in the absence of a concurrent compensating rise in the level of demand, the unit price of that bloc of securities would in all likelihood decrease.[2] Consequently, when the transfer hypothesized in a valuation proceeding involves a large bloc of securities, determination of the value of that bloc will necessarily entail consideration of the blockage factor. In such cases, therefore, the closing market quotation on a per share or per unit basis is the starting point for a determination of the actual value of blocs of securities; it is a point of reference rather than a final conclusion. What is being valued is a bloc, and not the individual units comprising the bloc.

---

[2] It should be noted that a bloc sale of securities will not always lead to a decline in the price per share. If the size of the bloc or the nature of securities is such that the bloc carries with it effective control of the enterprise, this control factor may well enhance the value of such securities, causing them to sell at a premium. The effect such bloc transfers have on the selling price of a security is commonly referred to as the blockage factor.

The opinion of the majority apparently recognizes that blockage is a factor in the sale of large aggregates of stock; it asserts, however, that blockage should not be considered in personal property tax valuations for several reasons.

First, the majority argues that any deviation from the published closing price would create administrative difficulties of major proportions. I find no factual support for this contention. Our taxing authorities have proved able to overcome these burdens in the inheritance tax area where this Court has recognized the effect of blockage on the value of sizeable holdings in a single security.[3] See *Clabby's Estate*, 308 Pa. 287, 162 Atl. 207 (1932). Valuation of a security for which no public market exists creates a valuation problem similar to, if not more complex than, the one here in issue, but there is no sign that the administrative officers of the taxing authorities in this Commonwealth have been unable to cope with it. There is no showing, moreover, that the application of the blockage factor would be appropriate except infrequently.

The majority further asserts that "imponderables too numerous to mention" would be introduced into the valuation process if the closing price of a security is not to be the sole determinant of its taxable value. But these same factors have already influenced the quoted market price. Taxing officials need consider only the effect on that price of an excess supply of the

---

[3] In this connection, we note the practice under the Capital Stock Tax Act, Act of June 1, 1889, P. L. 420, as amended, and the Franchise Tax Act, Act of May 16, 1935, P. L. 184, as amended, 72 P.S. §1871, where the Commonwealth levies a tax on the basis of the "actual value" of a determined portion of the capital stock of a corporation. The average selling price on the market of such capital stock serves as only one factor for consideration of the value of the stock as a whole. See Act of June 1, 1889, P. L. 420, §20, as amended, 72 P.S. §1902.

security in question. This single-factor analysis is not a matter of insuperable difficulty; surely it is easier, for example, than the valuation of an equity interest in a closely held company, and that is a calculation frequently made by our taxing authorities.

The opinion of the Court assumes that valuation of assets for personal property tax purposes remains quite distinct from the situation under the Inheritance and Estate Tax Act of 1961[4] where, under *Clabby's Estate, supra,* we have given effect to "blockage". In the latter case, it is argued, an actual sale becomes contemplated, while in the former, the taxpayer holds the property for investment. Aside from the conceptual problems encountered in valuing any item of property without postulating a transfer thereof, the decision of the Court creates difficulty in reading too much into the inheritance tax legislation. The frequency of gifts of specific property and of elections to take in kind in estate distributions speaks against this imagined differentiation unjustified by any statutory language. Whether or not the owner of property contemplates sale seems a totally irrelevant matter in determining the objective valuation of the property in the theoretical market place.

Finally, the majority resorts to a supposed legislative intent in support of its conclusion that the term "actual value" means market price and that blockage should therefore not be allowed for purposes of personal property tax valuation. The statutory language makes no such intent apparent; and I personally doubt that the legislature had any intent on this issue one way or the other.

Mr. Justice EAGEN joins in this opinion.

---

[4] Act of June 15, 1961, P. L. 373, as amended, 72 P.S. §2485-101 et seq.