## McKinney Estate

*George T. Forssell, Jr.,* of *Jack, Kookogey & Forssell,* for appellant.

*Frederick N. Frank,* for Commonwealth.

THOMAS, P. J., May 3, 1973.—The matter is before the court on appeal from an inheritance tax appraisal which placed a value of $78 per share on 18,870 shares of Pennsylvania Bank & Trust Company stock held in decedent's estate. The executor of the estate had placed a value of $55 per share on said stock in the face of admitted transactions around the time of death approximating $78 per share. The executor's posture is that the large number of shares held negated a normal market price approach and required the application of a "blockage theory."

## BACKGROUND

On the date of decedent's death, September 26, 1971, there were 454,514 shares of Pennsylvania Bank & Trust Company stock outstanding. Of the outstanding shares, 141,500 (31.1 percent) were in nine names, but about 53,000 of these 141,500 shares were held by the Pennsylvania Bank's trust department in a fiduciary capacity for 133 different trust accounts. The deceased's holding of 18,870 shares represented 4.15 percent of the outstanding bank shares and made him the largest individual stockholder. It can thus be seen that while decedent was the largest stockholder, his large block of shares carried no unusual value because of the possibility of control of bank fiscal policy.

The bank stock is and has been lightly traded, as indicated by the total sales in the three years preceding death.

| YEAR | | NUMBER OF SALES | SHARES TRADED |
|------|-------|-----------------|---------------|
| 1969 | | 57 | 3,756 |
| 1970 | | 53 | 2,292 |
| 1971 | | 45 | 3,795 |
| | Total | 155 | 9,843 |

Thus, the estate holds about twice as many shares as were sold in the three years prior to death. Of the 155 sales transactions of the stock over the three-year period, 122 involved sales of less than 100 shares.

The executor engaged the services of M. A. Schapiro and Co., Inc., New York, to make an analysis and render an opinion as to the fair market value of the bank stock on the date of decedent's death. Edward J. Powers, Jr., Vice President of Research for the Schapiro Co., appeared as a witness at the hearing. We need not here recite the experience, background and expertise of Mr. Powers but find as a fact that he is eminently qualified as an investment counselor and expert in establishing values of bank stock. One of his company's specialities is buying, selling and advising clients regarding bank stocks.

His findings are summarized as follows: Three "large" banks with stock actively traded in western Pennsylvania[1] and seven "local" banks[2] with relatively lightly traded shares were analyzed and compared to Pennsylvania Bank stock in financial areas significant in establishing the value of the stock. Mr. Powers then compared the Pennsylvania Bank shares at $78 a share with these 10 banks at their quoted bid price per share:

### THREE "LARGE" BANKS

|         | Price/Earnings Ratio | Premium Over Book | Yield  |
|---------|----------------------|-------------------|--------|
| High    | 10.1 times           | 28.2%             | 4.74%  |
| Low     | 7.1 times            | 5.5%              | 4.03%  |
| Average | 8.8 times            | 15.8%             | 4.37%  |

[1] Mellon National Bank & Trust Company, Pittsburgh National Bank, and Western Pennsylvania National Bank.

[2] First National Bank of Pennsylvania, Security Peoples Trust Company, Union Bank & Trust Company, Marine National Bank, First Seneca Bank & Trust Company, Northwest Pennsylvania Bank & Trust Company, and Warren National Bank.

## PENNSYLVANIA BANK & TRUST COMPANY

| | | | |
|---|---|---|---|
| At $78 per share | 19.2 times | 116% | 2.56% |
| At $55 per share | 13.5 times | 52.3% | 3.64% |

### SEVEN "LOCAL" BANKS

| | | | |
|---|---|---|---|
| High | 11.7 times | 66.5% | 5.65% |
| Low | 9.3 times | 7.3% | 3.33% |
| Average | 10.2 times | 25.4% | 4.08% |

## PENNSYLVANIA BANK & TRUST COMPANY

| | | | |
|---|---|---|---|
| At $78 per share | 19.2 times | 116% | 2.56% |
| At $55 per share | 13.5 times | 52.3% | 3.64% |

Mr. Powers stressed that in his professional opinion, the most significant statistic is the earnings multiple at which shares are selling and pointed out that on earnings of $4.06 per share in 1971, Pennsylvania Bank stock was selling at a multiple of 19.2—more than twice the average of the 10 banks analyzed.

The $78 price per share would mean a per share value of over *twice* book value which would be *four* times the average of the other seven local banks.

Mr. Powers gave weight also to the "yield" factor, pointing out that at $78 per share, the yield on the $2 annual dividend was 2.56 percent—lower than any of the 10 banks compared and far below their average yield of 4.16 percent.

While dividends of the bank increased from $1.28 per share in 1969, to $1.41 in 1970 and $2 in 1971 and 1972, Mr. Powers discounted this factor as his financial analysis indicates that while dividends have been increasing, net earnings of the bank have been declining.

Mr. Powers emphasized that even at the $55 per share used by the executor, the premium over book (52.3 percent) and yield (3.64 percent) still compare

unfavorably with the three national and seven local banks used for comparative analysis.

Mr. Powers' expert opinion was that the very large number of shares created a definite problem and he gave heavy weight to this "blockage" factor. His opinion was that the inordinate size of this block mandated sale at a substantial discount in addition to the unfavorable financial comparison factors previously elicited.

Mr. Powers' opinion was that the $55 per share used by the executor was still too high and that in his opinion the value was definitely under $55 per share and would not have exceeded $50 per share.[3]

Mr. Richard A. Gaylord was called as a witness by the executor. He is the branch manager in Warren, Pa., of the investment firm of Singer, Dean and Scribner. His knowledge of bank stocks, while limited to the two banks in Warren, Pa., namely Warren National Bank and Pennsylvania Bank & Trust Co., indicates he has his finger on the pulse of the investors in the Warren-Titusville area in relation to the two "local" bank stocks traded most heavily in his area.

He reports a modest demand for Warren National Bank stock with a "waiting list" of purchasers but little demand for Pennsylvania Bank stock and no "waiting list" of buyers. He sells annually 300 to 400 shares of Pennsylvania Bank stock but emphasized that the average purchaser of this stock in his area was either: (a) a customer of the bank, (b) an investor looking only to long term growth, (c) a present owner wanting a few shares to "round out" his holdings of bank stock, or (d) purchasers wanting a few shares for "sentimental reasons."

---

[3] Apparently Schapiro and Co. were not requested to render an opinion on valuation until after the price of $55 per share had been set by the executor and inheritance tax forms filed.

Mr. Gaylord has not been recommending purchase of this stock at its recent price and finds an extremely "thin" market when he has orders to sell.

Mr. Merle B. Mitcham, Senior Vice President and Trust Officer of Pennsylvania Bank, was called and testified to his knowledge of trading in the bank's stock. In Mr. Mitcham's opinion, the vast majority of sales and purchases of the bank's stock are by unsophisticated investors specially motivated by rumors, unsound investment theories, sentiment, or in one instance involving an 800-share purchase, a desire to become a director of the bank. Some years ago there was a "waiting list" for the stock but not in recent years when the bank has had trouble marketing its stock. Of the large number of shares the bank retains in its trust accounts, many are retained by direction in a trust agreement, by request of the beneficiaries, or are held because of unfavorable capital gain tax consequences if sold. Mr. Mitcham says he could not in good faith recommend this stock as a desirable investment at $70 per share. He opines that he might be able to dispose of a couple thousand shares a year at $69 or $70, but a substantial discount would be in order if the bank attempted to sell all 18,870 shares.

The Commonwealth called Cleon Livingston, the local inheritance tax appraiser, as its only witness. Mr. Livingston related that his valuation of $78 per share was arrived at by an examination of files in other recent estates listing Pennsylvania Bank stock as an asset. These were as follows:

| ESTATE | DATE OF DEATH | NO. OF SHARES | PRICE |
|---|---|---|---|
| B | April 11, 1971 | 1,236 | $78.50 |
| Wi | June 14, 1971 | 360 | 70.00 |

| We | July 4, 1971 | 105 | 79.00 |
| S | April 11, 1972 | 33 | 78.00 |
| McC | February 26, 1972 | 44 | 55.00 |

Mr. Livingston contended the McC estate appraised by him on February 26, 1972, at $55 per share was an error on his part and the valuation of $55 per share should not have been allowed.

The Commonwealth also introduced a letter from Parker-Hunter, Inc., one of the local brokerage firms in Meadville, showing the following:[4]

| SALE DATE | NO. OF SHARES | PRICE PER SHARE |
| --- | --- | --- |
| August 24, 1971 | 42 | $77.00 |
| August 26, 1971 | 46 | 77.00 |
| August 27, 1971 | 20 | 77.00 |
| October 18, 1971 | 35 | 78.00 |
| November 1, 1971 | 25 | 75.00 |

Also introduced was an exhibit from Trimbur Securities Corp., Investment Brokers, Pittsburgh, Pa., showing the following sales:[5]

| PURCHASE DATE | SHARES | PRICE |
| --- | --- | --- |
| August 2, 1971 | 10 | $76.00 |
| August 20, 1971 | 600 | 76.50 |
| September 9, 1971 | 20 | 75.00 |

With this statistical and factual background, we turn to the legal issues involved.

### DISCUSSION

The Commonwealth makes out a prima facie case upon introduction into the record of the inheritance

---

[4] Commonwealth Exhibit 2.

[5] Commonwealth Exhibit 1.

tax appraisal. The burden then falls upon the estate to show this appraisal is unfair or unconscionable: Clabby's Estate, 308 Pa. 287, 162 Atl. 207 (1932). There is no dispute between the parties regarding this principle of law.

The crux of the issue is whether the estate met its burden of showing the $78 per share was unfair, unjustified and not factually substantiated. This issue then resolves itself in a large extent to the question of whether the "blockage theory" applies to the inheritance tax appraisals in general and to the McKinney Estate in particular.

Counsel and this court have found few Pennsylvania cases for guidance in the "blockage" area. The Commonwealth relies heavily on McNeil Tax Assessment Case, 435 Pa. 553, 257 A. 2d 835 (1969), in arguing that the blockage theory should not be applied in this, or perhaps any other, case.

While McNeil rejected the blockage theory, it is easily distinguishable from the case here at issue because it involved an assessment of valuation of stock for a personal property tax, not inheritance tax. The Supreme Court refused to apply blockage to personal property tax valuations noting:

"It is clear that if blockage is applied in personal property tax evaluations, imponderables too numerous to contemplate would be introduced into the process. In addition to the factors enumerated by Judge Montgomery, one could add the most recent actions of the Federal Reserve Board, the prime interest rate, the actions of any number of committees of Congress, the state of the Paris peace negotiations and the actions of over a hundred foreign governments, to mention only a few. If for no other reason, the practical problem of evaluation which would be created precludes the application of the principle."

The Supreme Court, speaking through Justice O'Brien, rejected an analogy between personal property tax valuations and inheritance tax valuations:

"Moreover, we are not convinced that the analogy to the death tax situations is valid. In death tax evaluations, there may be good reason requiring the sale of the asset to be evaluated. Liquidation might be required for the payment of debts or taxes, or even because legatees did not choose to take in kind. In any event, in all such situations, there is an actual transfer of ownership. In personal property tax cases, the property is being held as an investment, is not being transferred, and the spectre of required sale does not loom over the evaluation."

It is on the above paragraph of obiter dictum that the Commonwealth urges us to reject the blockage theory in this case. Using this dictum, the Commonwealth argues that the estate has not shown that these criteria have been met and, accordingly, the blockage theory is not applicable. We prefer to treat this dictum language of the Supreme Court as such and would only hope that when an appropriate case in the "blockage inheritance tax" area comes before the court, further consideration will ground the blockage theory on equitable principles and not on the questionable tests enumerated in this dictum. We cannot conceive that the use or nonuse of the "blockage" theory must rest on such self-manipulating situations as, (a) whether stock as contrasted to other assets is to be sold to pay debts or taxes, (b) the beneficiary's decision of whether to take his inheritance in cash or kind, or (c) the mere fact that ultimately, upon settlement of the estate, there will be a transfer of ownership.

Our Supreme Court in Clabby's Estate, supra, laid down the basic premise that the blockage theory can be used under appropriate circumstances and bases

its use on equitable principles rather than principles founded on the maneuvering or whim of the executor or beneficiary, as would be the rule if the theories of the McNeil dictum were applied. Justice Kephart in Clabby noted:

"The test is, value at the date of death. But, the value of a few shares of stock on the day of death does not always fix the value of large blocks of stock, in this case over 8,500 shares. If these shares were placed on the market for sales on the day Clabby died they might not have brought anything like the price of a few shares. Both sides called brokers as witnesses to show this fact. They testified as to the effect of throwing large blocks of stock on the market. This evidence of experts was entirely competent to show the error in accepting the price of a few shares on a given date as governing a large block offered for sale.

"The rule for determining value for inheritance taxation contemplates a range of the entire market and the averaging of prices as found running through a reasonable period of time: Kountz v. Citizen's Oil Ref. Co., 72 Pa. 392; Seward v. Penna. Salt Mfg. Co., 78 Pa. Superior Ct. 319.

"As different uses of [real] property may be considered in forming an opinion of its worth, so the evidence here given by appellant and the Commonwealth as to the result of throwing large blocks of stock on the market, though differing in amounts, may be considered. Men who have had experience in selling stock in lots both large and small are therefore competent to give an opinion as to the effect of dumping a large block of stock on the market. It was therefore competent to show what in the opinion of the experts the value of the stock thus sold would be under actual conditions in business."

The value of stock in any estate is a question of fact: McLure Appeal, 347 Pa. 481, 32 A. 2d 885 (1943). Equi-

table principles have application in tax problems the same as in other matters: Phipps v. Commissioner, 127 F. 2d 214 (1942).

Moffett Estate, 369 Pa. 159, 85 A. 2d 109 (1952), involved inheritance tax value of closely held stock and while we are not here concerned with closely held stock but stock that is lightly traded, we think the language of Justice Stearne is equally applicable:

" 'Clear value' of such taxable property is, therefore, its estimated net worth. It is manifest that such net worth cannot, in *every* case, be measured by either market or book value. In some cases, however, in varying circumstances, either market or book value of property *may* be its net worth. A stock freely sold on the stock exchange might well have its worth established in such market. But where, as here, stock is closely held and represents but a minority interest, and is rarely sold, (and when sold perhaps under necessity or pressing circumstances) such sales do *not* fairly establish a true market value." (Italics supplied.)

The blockage theory has long been recognized in fixing valuations in Federal estate tax cases: Helvering v. Maytag, 125 F. 2d 55 (1942), cert. denied 316 U.S. 689; Jenkins v. Smith, 21 F. Supp. 251 (1937). It is recognized and authorized as a factor in determining Federal estate tax valuations. See Federal Tax Regulations, Estate and Gift Taxes, §20.2031-2(e).

We deem the citation of further Federal and other States' cases to be unnecessary. We are convinced that the value definition under the Inheritance and Estate Tax Act of June 15, 1961, P. L. 373, 72 PS §2485-102 (24),[6] mandates the application of common sense and the blockage factor to this case. One might rhetorically

---

[6] "(24) 'Value' means the price at which the property would be sold by a willing seller, not compelled to sell, to a willing buyer, not compelled to buy, both of whom have reasonable knowledge of the relevant facts."

ask: "What willing buyer, not compelled to buy and having reasonable knowledge of all the financial aspects of Pennsylvania Bank stock and that of other large and small banks in the area, and with $1,471,860 to invest on September 26, 1971, would have paid $78 per share for 18,870 shares of Pennsylvania Bank & Trust stock?" The question answers itself; for the same amount of capital investment could have brought a higher rate of return in literally hundreds of "big board" stock and bond market listings; and, if western Pennsylvania banks were our theoretical investor's whim,— then any of 10 other prestigious banks would have been a far more lucrative situation.

In order for other sales of stock of unlisted securities to be representative of a fair value per share, the amount of the other stock sold must bear some reasonable relation in volume to the amount of stock being valued. The Commonwealth argues that the estate has failed to meet its burden because they have failed to show an attempt to market the *entire* block of stock. Additionally, they stress that Mr. Mitcham opined that he could perhaps market 2,000 shares of this stock per year and maintain the market price at which smaller blocks have been selling.

This argument flies in the face of reality and common sense. We cannot conceive that the executor can only meet his burden of proof by throwing on the market "for a test run" this inordinately large block of lightly traded stock to see what market speculators will offer. This suggested test flies in the face of the act's value definition which mandates the property be sold by a *"willing seller not compelled to sell."*

We find nothing in the act or case law suggesting that if the stock can be disposed of in small blocks ad seriatim over a period of time that this fact is to be considered in establishing its value. Value of the stock for

inheritance tax purposes mandates an estimation of price that could have been obtained for the total number of shares on the date of death since fair market value means the price that could actually have been realized on that date. Indeed, section 501 of the act, 72 PS §2485-501, mandates that the valuation date, except for limited situations not here applicable, shall be the date of death. Even if the executor chose to market a thousand or two shares periodically over the next decade and a projected price per share was envisioned in the $70 to $78 range, this ad seriatim in futuro approach is unrealistic, requires a clairvoyant view of the future, and most importantly, is prohibited by section 501 of the act.

Only a romantic sentimentalist, or a truly unsophisticated investor would have been prone to invest $1,471,860 in Pennsylvania Bank stock on September 26, 1971, knowing that his 18,870 shares would give him no semblance of corporate control, a meager 2.56 percent yield, participation in a declining net earnings pattern and dim hope that even a continuing pattern of dividend increases would give him a five percent yield on his money in the near future.[7]

We find as a fact that while small blocks of bank stock were selling in the $75 to $78 per share range around the time of Mr. McKinney's death, these prices were not exclusively indicative of the true value of

---

[7] Dividends were $1.28 in 1969, $1.41 in 1970, $2 in 1971, and $2 in 1972. This averages to a 36 cent per share increase for the 1969-70 and 1970-71 comparisons. A continuation of this same pattern then should have produced, but did not, a $2.36 dividend in 1972, $2.72 in 1973 and $3.08 in 1974. Thus, if the projected pattern became a reality, the yield at $78 per share would have been three percent in 1972, 3.48 percent in 1973 and 3.9 percent in 1974. It would projectively be 1977 before the yield would exceed five percent.

Pennsylvania Bank shares and were of little significance in fixing the value per share of the huge block of stock held in this estate.

Whether we call it a "blockage theory," "common sense," "equitable evaluation" or "the realities of the market place," we are satisfied that we are faced with an unusual and unique situation that requires us to reject the Commonwealth's appraisal and apply a more equitable value to these shares.

The witnesses called by the estate were impressive. We accepted their testimony as credible and realistic. We believe the estate has met the challenge of coming forth with credible evidence to carry its burden of overcoming the Commonwealth's prima facie case. The Commonwealth called only the inheritance tax appraiser whose testimony and value setting technique did not even represent his own evaluation or opinion, but merely represented a valuation placed on this stock by *other executors* in *other estates*. This valuation was corroborated by brokers' statements eliciting sales prices for some 798 shares in eight transactions sold in a three months' period prior to Mr. McKinney's death.

The Commonwealth did not choose to counter "expert with expert" and produce witnesses who would point to salient features of the bank's past, present or future financial picture which would justify this seemingly inflated per share price of its stock.

A comparative analysis with other banks in the area, equity, the "blockage theory" and common sense leads us to the conclusion that $78 per share is a grossly inflated price for a block of 18,870 shares of Pennsylvania Bank & Trust Company stock. We conclude the executor has sustained its burden of proof and its evaluation of this block of shares at $55 per share is a fair and reasonable valuation in accord with the descrip-

tion of "value" as mandated in section 102(24) of the Inheritance and Estate Tax Act of June 15, 1961.

## ORDER

And now, May 3, 1973, the appeal of Pennsylvania Bank & Trust Company, Executor of the Estate of Donald L. McKinney, is sustained, the Commonwealth's appraisement valuation dated October 27, 1972, of 18,870 shares of Pennsylvania Bank & Trust Company stock at $78 per share is set aside and the executor's value for said shares at $55 per share is affirmed.